Phyllis SHAPIRO, Plaintiff,

v.

CADMAN TOWERS, INC. and
Sydelle Levy, Defendants.

No. CV–93–5764 (CPS).

United States District Court,
E.D. New York.

Jan. 25, 1994.

Szold & Brandwen, New York City by Alan G. Blumberg, Ezra N. Goodman, Robert I. Goodman, for defendants Cadman Towers and Levy.

U.S. Dept. of Justice, Civ. Rights Div., Housing & Civil Enforcement Section, Washington, DC by Barbara Kammerman, for U.S.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This application for a preliminary injunction pursuant to 42 U.S.C. § 3613(c)(1) and Fed.R.Civ.P. 65 is made by plaintiff, Phyllis Shapiro, to enjoin defendants, Cadman Towers, Inc. and Sydelle Levy, president of the Board of Directors of Cadman Towers, from refusing to provide plaintiff with a parking space on the ground floor of her apartment's garage, located at 101 Clark Street in Brooklyn. Plaintiff's complaint states two claims for relief—one pursuant to 42 U.S.C. § 3604 and one pursuant to 42 U.S.C. § 3617, both provisions of the Fair Housing Amendments Act ("FHAA"). Section 3604 prohibits discrimination in housing on the basis of race, color, religion, sex, handicap, familial status, or national origin and defines discrimination to include, *inter alia,* a failure to make a reasonable accommodation in housing rules and regulations in order to allow a handicapped individual equal opportunity to use and enjoy a dwelling. Plaintiff claims that defendants' refusal to modify their first come/first served policy in the granting of parking spaces at 101 Clark Street to accommodate her special need for a parking space constitutes a violation of section 3604. Section 3617 provides that it shall be unlawful to coerce, intimidate, threaten, or interfere with any person on account of her having exercised or enjoyed any right granted or protected by the Fair Housing Act and its amendments. Plaintiff claims that defendants attempted to coerce or intimidate her in her exercise of her fair housing rights by refusing to place her name on the parking space waiting list for 101 Clark Street until she had withdrawn the discrimination com-

Goldfarb & Arbrant, New York City by David Goldfarb, Anne Tozier, for plaintiff.

plaint she had filed with the Department of Housing and Urban Development ("HUD").

Following plaintiff's motion, the United States filed a complaint setting forth similar claims for relief on plaintiff's behalf as authorized by 42 U.S.C. § 3612(o)(1), and the two cases were thereafter consolidated. A hearing was held between January 4, and January 6, 1994, on plaintiff Shapiro's application for preliminary injunctive relief in which counsel for both the private parties and counsel for the government participated.

Based on the credible testimony of witnesses and the undisputed portion of the affidavits and exhibits presented by both sides on this application, plaintiff's request for a preliminary injunction is granted.

What follows sets forth the findings of fact and conclusions of law on which that determination is based, as required by Federal Rule of Civil Procedure 65.

## BACKGROUND

Plaintiff, Phyllis Shapiro, is a guidance counselor at Middle School 88 in Brooklyn and a resident of Cadman Towers, a residential complex located on the edge of the Brooklyn Heights neighborhood of Brooklyn, New York. In 1975, plaintiff was diagnosed as suffering from multiple sclerosis. Multiple sclerosis is a chronic, progressive disease of the central nervous system, which primarily affects young women. The cause of multiple sclerosis and its cure remain unknown. Its symptoms include physical weakness, difficulty in walking, loss of balance and coordination, visual disturbance, fatigue, loss of stamina and severe headaches. Through the years and at different times, plaintiff has displayed a number of these symptoms, particularly those relating to her motor skills. The onset of these symptoms, their frequency, and severity are unpredictable, although there are some warnings of their onset. In plaintiff's case, the illness has followed a "relapsing progressive" course, meaning a pattern of progressive deterioration which in the course of time will likely totally disable her.

Like many multiple sclerosis sufferers, plaintiff is afflicted not only with problems of stamina and balance but also with a related neurogenic bladder disorder. Due to interference with the nervous system's mechanism for triggering a felt need to urinate, plaintiff's bladder is stretched and progressively collapsing onto itself, with the result that plaintiff has difficulty emptying her bladder. Since she is, as a result of the underlying illness, afflicted with painful bladder spasms of an incompletely voided bladder, she is from time to time rendered incontinent. To minimize the number and extent of these stressful episodes, plaintiff has in the past used a self-catheter. She has, however, frequently found herself involuntarily urinating between catheterizations, when unable to find a nearby restroom. In an attempt to shrink her bladder, plaintiff is currently using an indwelling catheter and an attached leg bag for a three month period. The procedure has its own negative side effects, including increased risk of infection. In fact, plaintiff has developed serious infections since the implant. Medications she takes for her related problems increase her liquid intake, thereby increasing her need to urinate. In the event plaintiff's abnormally large bladder cannot be shrunk, she faces a choice of surgery on her bladder or living with incontinence.

Although plaintiff's condition is slowly deteriorating, the regularity and intensity of her symptoms fluctuate. During good periods, plaintiff is able to walk by herself for short distances on level ground. At other times, however, she can only walk with the assistance of a cane or a wheelchair. In her workplace, plaintiff utilizes a motorized scooter, particularly as she tires in the afternoon. Like other multiple sclerosis patients, plaintiff's condition is aggravated by emotional stress and by extreme temperatures occurring during winter or summer. Also like other patients, plaintiff is periodically subject to episodes in which she experiences near or total paralysis, which so far do not last long.

Plaintiff employs her own car, a present from her mother, to get to work. Her attempts to use public transportation have been unsuccessful. She relies exclusively on her car for transportation beyond the immediate proximity of her apartment, except dur-

ing such episodes when she cannot drive, when she uses a car service. In July of 1992, plaintiff received a special handicapped parking identification from the New York City Department of Transportation, which allows her to park at parking meters without paying and exempts her from the City's alternate side of the street parking rules.

Plaintiff currently parks her car on the street in Brooklyn Heights. Because plaintiff's apartment building is on the edge of residential Brooklyn Heights, next to the downtown commercial area, plaintiff must, at least until late evening, compete with both residential and nonresidential car owners to find a space. She must then walk from the parking place on the street to her apartment building with greater or lesser difficulty depending on the weather, time of day, whether the walk is uphill or downhill [1] and the distance. At the moment, in New York's most severe recent winter, the dangers of the walk are aggravated due to icy conditions. Until recently, plaintiff's best hope of a spot was on a one block street named Monroe Place just south of her apartment building where she can take advantage of her exemption from alternate side of the street parking rules. However, other drivers, including officials employed at or visiting the courthouse on Monroe Place of the Appellate Division, Second Department, who also enjoy exemption from the City's parking rules, compete with her for this space until they leave in the evening. Moreover, the parking is adjacent to one- and two-family brownstones, one resident of which, plaintiff credibly testified, has threatened her with reprisals if she continues to interfere with the street cleaning schedule of his neighborhood. As a result of these

problems, it has, on occasion, taken plaintiff as much as forty-five minutes to find a parking space, and her incontinence has forced her to relieve herself on the street or in the car. On other occasions, as both plaintiff and an employee of her building's security service called by the defendants testified, she has arrived at the building lobby in such distress as to have to use a lavatory in the lobby to relieve herself. Once plaintiff reaches her apartment she describes herself as feeling on occasion "like a prisoner," since the problems of losing her spot and having to find another at a late hour are too daunting to face.[2]

As noted, plaintiff resides in an apartment at defendant Cadman Towers, Inc., a cooperative housing corporation in Brooklyn, New York. Cadman Towers is a city-aided cooperative, organized and existing under Article 2 of the New York State Private Housing Finance Law to provide housing to persons of low and moderate income. It is also subject to the regulatory supervision of the New York City Department of Housing Preservation and Development. The cooperative has 423 apartments, each occupied by one or more holders of shares of its stock. The shareholders elect a Board of Directors consisting of nine resident shareholders. The Board has a fiduciary responsibility to all shareholders, setting its policies and making all significant decisions. The president of the cooperative, defendant Sydelle Levy, is a resident shareholder and one of the nine Board members.

Cadman Towers consists of two buildings located around the corner from of each other—one at 101 Clark Street ("101 Clark") and the other at 10 Clinton Street ("10 Clinton"). There are approximately half as many

---

**1.** Plaintiff describes a gradual incline from north of her building to her building as a hill. Her neighbors who testified at the hearing disputed this description. It is obvious that the incline is a hill to plaintiff.

**2.** Of course, all apartment dwellers suffer from problems of the same kind as plaintiff, *i.e.*, all feel, for one reason or another at sometime or another, prisoners in their own home. Ms. Shapiro's problems are, however, not of the same degree. Others, for example, can use the nearby IRT subway to have dinner with a friend in "town," as Brooklyn Heights residents call Manhattan. Ms. Shapiro cannot. In the absence of

public restrooms in New York City, many women (and men) have developed a private road map of restaurants, hotels, and gas stations that permit patrons and sometimes nonpatrons to use a lavatory. Because of her handicap, Ms. Shapiro requires facilities closer to her home than most. What the FHAA requires is that the handicapped person be reasonably accommodated so as not to deprive her of an opportunity equal, insofar as possible, to that of the nonhandicapped to use and enjoy her dwelling, *i.e.*, an accommodation which to a reasonable degree makes her no more a prisoner in her own home than others who do not suffer from the problems she does.

parking spaces in the complex as there are apartments. 101 Clark has 302 apartments and 64 indoor parking spaces, and 10 Clinton has 121 apartments and 136 indoor parking spaces. The parking rate at either location at Cadman Towers is approximately $90 a month plus tax, whereas the nearest commercial parking in the neighborhood is $275 a month.

Due to the disparity in numbers between apartments and parking spaces, the cooperative has in the past generally allocated spaces on a first come/first served basis and required users of parking spaces to live in one of the two buildings and residents to enjoy no more than one parking space per apartment. There are, however, exceptions to this general policy. Six shareholders have two spaces. The explanation for this given by the Board's president is that the six got these spaces during a period when there was low demand. At least one elderly resident is allowed to let her son, who does not live with her, use her space, apparently because she does not drive and her son, on occasion, does errands for her. In the past, a resident with severe emphysema was given a parking space without regard for the waiting list and then accommodated to the extent of being allowed to offer a $1,000 reward for a space closer to his apartment in contravention of the usual policy prohibiting the sale of parking spaces. Also excepted from the first come/first served, residents-only policy are three spaces given without charge to building employees as part of the employees' compensation.

When the first come/first served policy is followed, the resident's name is placed on a waiting list, and when a parking space is awarded, the resident may use the space until he or she vacates the apartment. To obtain a spot on the waiting list, residents are required to communicate their desire to be placed on such list in writing and are placed on the list as of the date their letter is received. An applicant must be over eighteen years of age and a resident. With the exceptions noted above, residents are limited to one parking space per unit. The restrictions and the procedure to be followed in requesting a space are spelled out in a build-ing guide, the Cadman Towers Handbook, which is supposed to be provided free to all residents upon taking up residency.

Because there are so many more apartments than parking spaces in 101 Clark than there are in 10 Clinton, there is a greater demand for parking spaces in the former. When an applicant's name appears at the top of the general waiting list, the resident is assigned the next available space at 10 Clinton. Persons with spaces in 10 Clinton who reside in 101 Clark can then apply to be placed on a second waiting list for a parking space in 101 Clark. The most recent award of space in 10 Clinton was to an applicant who went on the waiting list towards the end of 1989. People at the top of the 101 Clark list are said to have been waiting for space since the early 1980's.

In September of 1989, plaintiff applied to buy an apartment in the complex. At the time, she informed the building management and Board that she suffered from multiple sclerosis and further checked a box on the application form indicating that she would be seeking a parking space. Plaintiff claims not to have been informed that there was a waiting list for these spaces and does not recall receiving the building guide containing the parking space application procedures. Defendants do not consider the application to buy an apartment, even when completed as plaintiff completed it, to be an application to be placed on the waiting list for a parking space.

In June of 1990, plaintiff purchased her apartment at 101 Clark and has resided there since that time. On two occasions in February and March of 1992, plaintiff called the property manager for the complex and requested a parking space in 101 Clark due to her handicap. Plaintiff was informed that she would not be given a space and that her name would have to go on the waiting list. On March 25, 1992, plaintiff renewed her request for an immediate parking space by letter. The letter was written by plaintiff's brother, a lawyer, and contained information regarding plaintiff's handicap. Defendants again denied plaintiff's request. On April 14, plaintiff submitted another letter, this time

written by her present counsel. The Board denied this request as well.

At the hearing before the undersigned, defendant Levy testified that the principal reason for denying plaintiff's application was the Board's concern with maintaining the integrity of the waiting lists which the Board felt would be threatened by any type of exception. In addition, it appears clear that the Board was suspicious of plaintiff's handicap. This suspicion remained unexamined, that is, no request for additional medical information or physical examination was made by the Board or any of its members, and Board members, like a number of building residents who testified at trial, confined themselves to remarking that they had not noticed that plaintiff had difficulty walking. (A witness at trial testified that "she seemed normal to me." Plaintiff, in an unrelated response to cross-examination by defendants' counsel at the hearing, gave the appropriate answer to these comments: that discrimination against the handicapped often begins with the thought that she looks just like me—that she's normal—when in fact the handicapped person is in some significant respect different. Prejudice, it bears recalling, includes not just mistreating another because of the **difference** of her outward appearance but also assuming others are the **same** because of their appearance, when they are not.) Another ground for the Board's suspicions and for issues raised about plaintiff's credibility at the hearing were questions about her candor in asking for a two-bedroom apartment in her initial application because of a need for a 24–hour–a–day attendant as a result of her progressive disease. So far plaintiff has had an attendant with her only when suffering from near or total paralysis. Given the dire prognosis plaintiff has been given by her doctors, it is not at all incredible that she has and will face the need for a round-the-clock companion, and in fact a companion will undoubtedly in the future be called upon more and more regularly to share plaintiff's living space.

After receiving the letter from plaintiff's brother and after consulting with their own counsel, the Board took the position that any duty to accommodate plaintiff's disability would only come into being at the time she was awarded a parking space, and not before. As expressed by defendant Levy, the Board's position was and remains that no reasonable accommodation is due plaintiff at the waiting list stage and that she must wait the same number of years as a nonhandicapped tenant before she obtains a space. When she is awarded a space, the Board then appears to have in mind considering whether existing spaces should be rearranged so as to place plaintiff's space in 101 Clark rather than in 10 Clinton.

On June 11, 1992, plaintiff filed a complaint with the United States Department of Housing and Urban Development ("HUD"), alleging housing discrimination pursuant to FHAA. HUD conducted an investigation, reviewing evidence produced by plaintiff, defendants, and other residents of Cadman Towers. On November 29, 1993, the Secretary ruled in plaintiff's favor and issued a Determination of Reasonable Cause and Charge of Discrimination. Plaintiff filed this action shortly thereafter.

## DISCUSSION

42 U.S.C. § 3613(c) provides that, in a civil action under the provisions of the FHAA, the court may grant as relief any permanent or temporary injunction "or other such order (including an order enjoining the defendants from engaging in such practice or ordering such affirmative action as may be appropriate)."

In order for a preliminary injunction to issue, plaintiff must demonstrate (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See Communications Workers of America, Dist. One, AFL–CIO v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir.1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (*per curiam*). The showing of probable harm is the "single most important prerequisite for the issuance of a preliminary injunction," *Bell and Howell v. Masel Co.*, 719 F.2d 42, 45 (2d Cir.1983),

and the moving party must show that injury is likely before the other requirements for an injunction will be considered. Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages. *See Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989).

■ Plaintiff easily meets the first requirement for a preliminary injunction, namely, the likelihood of irreparable harm should the injunction not issue. As a patient suffering from multiple sclerosis, plaintiff is subject to an incurable disease that gradually and progressively saps her strength and interferes with her balance and bodily functions. Without a parking space in her building, plaintiff is subjected to risks of injury, infection, and humiliation substantially different in kind and magnitude from the inconveniences the nonhandicapped driver faces in finding parking on the City's streets. Plaintiff's disease makes her a candidate for accidental loss of balance, particularly during the winter season when her condition is aggravated. In addition, her urinary dysfunction results in episodes of embarrassing humiliation and discomfort which could be significantly reduced were she allowed to park indoors. The inconvenience suffered by a typical city resident forced to deice the car after a winter snowstorm is mild when compared to the discomfort, stress, and ensuing fatigue experienced by plaintiff when faced with the same task. Under these situations, it is clear that plaintiff has met her task of demonstrating a likelihood of irreparable harm were her exclusion from parking in the building allowed to continue during the pendency of this litigation.

An analysis of plaintiff's likelihood of success on the merits requires a preliminary discussion of the statutory framework within which plaintiff brings her action. The FHAA was passed by Congress in 1988 with the stated purpose of (1) creating an administrative system to enforce the nation's housing discrimination laws, (2) extending the principle of equal opportunity to handicapped individuals, and (3) extending these civil rights protections to families with children. *See*

H.R.Rep. 711, 100th Cong., Fair Housing Amendments Act of 1988, House Committee on the Judiciary (June 17, 1988). The central provision of the Fair Housing Act, as amended in 1988, remains 42 U.S.C. § 3604, which now prohibits discrimination in housing against any person on the basis of his or her race, color, religion, sex, handicap, familial status, or national origin. In particular, section 3604(f)(2) forbids

> discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of ... that person....

Section 3604(f)(3) further defines discrimination as including

> a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling....

Under the 1988 amendments, a person believing herself to be the target of a discriminatory practice under the Fair Housing Act is entitled to file a complaint with the Secretary of HUD. Upon receiving the complaint, the Secretary is to conduct an investigation, *see 42 U.S.C. § 3610(a)(1)(B)(iv),* and to attempt conciliation. If a conciliation cannot be attained, the Secretary is to make a determination as to whether reasonable cause exists to believe that a discriminatory housing practice has occurred. *See 42 U.S.C. § 3610(g).* If the Secretary believes that discrimination has occurred, he is instructed to issue a charge on behalf of the aggrieved party. *See 42 U.S.C. § 3610(g)(2)(A).* Such a finding and charge have been issued in this case. The parties then have the option to elect to bring the proceeding before an administrative judge or commence an action in a federal district court. *See 42 U.S.C. § 3612(a).* In this case, plaintiff elected to have her case heard in this Court. Pursuant to 42 U.S.C. § 3612(*o*)(1), the Secretary then authorizes the Attorney General to commence a proceeding on the aggrieved individual's behalf.

42 U.S.C. § 3613(a)(1) also allows an aggrieved person to commence a civil action in

an appropriate United States district court or state court no later than two years after the occurrence of the discriminatory housing practice. Because of plaintiff's need for immediate relief, she has filed this action without waiting for the Attorney General to commence hers.[3] The Justice Department filed its action shortly thereafter.

■ As a preliminary matter, it is clear that plaintiff is the type of individual intended to be protected by the Act's provisions. A handicapped person is defined in 42 U.S.C. § 3602(h) as one who has "a physical or mental impairment which substantially limits one or more of such person's major life activities, [has] a record of having such impairment, or [is] regarded as having such an impairment...." There is no question that plaintiff's multiple sclerosis is a handicap which may substantially limit a person's major life activities. *See, e.g., Carter v. Casa Central,* 849 F.2d 1048 (7th Cir.1988) (multiple sclerosis is a handicap under analogous section of the Rehabilitation Act). It is a finding of this Court that plaintiff is afflicted with this condition and that her affliction is sufficiently severe to substantially limit her major life activities. In making this determination, I rely on the medical evidence introduced at the hearing and place little weight on the Board's suspicions concerning the bona fides of plaintiff's condition or the testimony of lay witnesses that plaintiff appeared normal.[4] As the court stated in *D'Amico v.*

*New York State Board of Bar Examiners,* 813 F.Supp. 217, 223 (W.D.N.Y.1993): "The [defendant's] opinion as to what is "reasonable" for a particular [person] can be given very little weight when the [defendant] has no knowledge of the disability or disease, no experience in its treatment, and no ability to make determinations about the physical capabilities of one afflicted with the disability or disease."

■ Nor is there much question that defendants' first come/first served policy is a rule, policy, or practice within the meaning of the FHAA and that indoor parking is part of the services and facilities provided at plaintiff's building.

In a case such as this, plaintiff's need to show a likelihood of success on the merits would usually translate into demonstrating that defendants had a duty to reasonably accommodate her request for a parking space and that no such reasonable accommodation was made. In the present case, however, defendants have conceded that they made no attempt at an accommodation, and the central issue for resolution remains only the existence of defendants' duty.[5]

■ Defendants appear to make the argument that, because plaintiff has not yet made it to the top of the list, when she would be entitled to a parking space under the building's existing regulations, indoor parking is

---

**3.** As noted, plaintiff has also pleaded a separate cause of action against defendants pursuant to 42 U.S.C. § 3617, which provides that it shall be unlawful to coerce or threaten any person in the exercise of the enjoyment of his or her rights under the provisions of the FHAA. Plaintiff alleges that after she had filed the HUD complaint she was notified by defendants that, if she submitted a written request for placement on the waiting list, her name would be placed on the list retroactive to her date of occupancy. Plaintiff accepted defendant's offer, while stating that in no way was she withdrawing or settling her HUD complaint. Plaintiff alleges that as a retaliatory act defendants refused to place her on the list retroactively and informed her that her placement on the list would be as of the date of application. As of this date, however, plaintiff is not on any list. Defendants allege that the offer was an attempt at settlement and conciliation, which can neither be the object of a lawsuit nor made public without all the parties' consent. In any case, as this second cause of action is not

germane to plaintiff's motion for a preliminary injunction, it will not be discussed further.

**4.** Since plaintiff's symptoms are episodic, it is not of much significance that the few neighbors who testified at the trial said that they had not witnessed an episode, particularly when they are busy New Yorkers who, by their own admission, have had virtually no social contact with their neighbor. While not concealing her handicap, plaintiff has also not broadcast it.

**5.** Some argument might be made that a policy of no accommodation was reasonable. But that is not the process the Board followed, as evidenced by its failure to consider (1) the nature and extent of plaintiff's disability and (2) the availability of means to accommodate that disability. In all events, for the reasons herein noted, a policy of no accommodation given plaintiff's condition and the available alternatives was not reasonable.

not yet part of the services and facilities provided "in connection with plaintiff's dwelling." Such an argument, however, ignores the fact that parking space at Cadman Towers is something all shareholders, including Ms. Shapiro, own and control in common as members of the cooperative corporation. *See* N.Y.Coop.Corp.Law § 14(h); *see also* Cadman Towers Handbook, p. 8 (Defs.Ex. Q). The first come/first served policy is not, in other words, a creature of the lease to Ms. Shapiro's apartment or her contract of sale but of the building's rules and regulations which may be changed by the appropriate vote of all the members of the cooperative under the building's by-laws. *See* N.Y.Coop. Corp.Law § 44; *see also* Cadman Towers Handbook, p. 9 (Defs.Ex. Q).

▮ The fact that the rules and regulations are longstanding does not exempt them from the FHAA. As the House Report[6] on the amendments states, the section at issue—

> makes it illegal to refuse to make reasonable accommodation in rules, policies, practices, or services if necessary to permit a person with handicaps equal opportunity to use and enjoy a dwelling. The concept of "reasonable accommodation" has a long history in regulations and case law dealing with discrimination on the basis of handicap. **A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted.** This section would require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.

H.R.Rep. No. 711, 100th Cong., *reprinted in* 1988 U.S.C.C.A.N. 2173 (emphasis added).

▮ Defendants also appear to argue that the fact that there are fewer parking spaces than apartments or "dwellings" also somehow severs the connection between the dwellings and the parking spaces. Although the House Report was correct in noting that the phrase "reasonable accommodation" has been much written about in connection with other types of discrimination and discrimination against the handicapped in other areas, there is remarkably little authority on its meaning and requirements in a housing situation such as the one faced here, involving the allocation of a scarce good among handicapped and nonhandicapped individuals.[7] Nevertheless, it seems common sense that in a situation of scarcity each individual has a connection with the scarce good.

Case law interpreting the "reasonable accommodation" language in the provisions of the FHAA has analogized the language to similar provisions in the Federal Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, in particular to section 504 of the Act, 29 U.S.C. § 794, which bars discrimination against the handicapped by any recipient of federal financial assistance. *See Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450 (D.N.J. 1992). Although section 504 does not itself include the term "reasonable accommodation," the statute requires that all federal agencies promulgate regulations to fully implement the statute's requirements. Pursuant to this mandate, a number of administrative agencies have issued regulations mandating "reasonable accommodations" to implement the requirements of the statute. *See, e.g.,* 7 C.F.R. § 156.3 (Department of Agriculture); 10 C.F.R. § 1040.67 (Department of Energy); 11 C.F.R. § 6.103 (Federal Election Commission); 24 C.F.R. § 8.11 (Department of Housing and Urban Development).

In *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court discussed the concept of reasonable accommodation in the context of section 504 and of regulations imposed by the Department of Health, Education and Welfare. The Court held that an accommodation was reasonable

---

6. No Senate Report was submitted for this legislation.

7. Several cases interpreting this language in the FHAA have dealt with it in terms of zoning restrictions applied to block housing for the handicapped and are of little help here. *See, e.g., Smith & Lee Associates, Inc. v. City of Taylor,* 13 F.3d 920 (6th Cir.1993); *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450 (D.N.J. 1992).

if it would not impose an undue hardship or burden upon the entity making the accommodations and would not undermine the basic purpose which the requirement at issue seeks to achieve.[8] The Court reaffirmed this ruling in two later cases dealing with the Rehabilitation Act. *See School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).[9] Other courts have applied this standard to FHAA cases. *See Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1186 (E.D.N.Y.1993); *Oxford House v. Cherry Hill*, 799 F.Supp. at 461.

As with other agencies under the Rehabilitation Act, HUD was given the power to promulgate regulations instituting the provisions of the Fair Housing Act. *See* 42 U.S.C. § 3614a. 24 C.F.R. § 100.204(b) was the regulation specifically promulgated by HUD to implement the "reasonable accommodation" requirements of section 3604. After restating the language of the statute, the regulation proceeds to give two examples of a reasonable accommodation. The first involves a blind applicant for rental housing who wished to keep her seeing eye dog in a building with a "no pets" policy. The example states that allowing the handicapped individual to keep her dog would be a "reasonable accommodation" within the meaning of the regulation.

The second example given in section 100.204 involves a handicapped resident of a building in need of a specific parking space. Given the similarities between the example and the current case, the example is reproduced here in its entirety:

> Progress Gardens is a 300 unit apartment complex with 450 parking spaces which are available to tenants and guests of Progress Gardens on a first come first served basis.

John applies for housing in Prospect Gardens. John is mobility impaired and is unable to walk more than a short distance and therefore requests that a parking space near his unit be reserved for him so he will not have to walk very far to get to his apartment. It is a violation of § 100.-204 for the owner or manager to refuse to make this accommodation. Without a reserved space, John might be unable to live in Progress Gardens at all or, when he has to park in a space far from his unit, might have difficulty getting from his car to his apartment unit. The accommodation therefore is necessary to afford John an equal opportunity to use and enjoy a dwelling. The accommodation is reasonable because it is feasible and practical under the circumstances.

24 C.F.R. § 100.204(b).

At least one administrative decision, *HUD v. Dedham Housing Authority*, 1992 PH, Inc. Fair Housing–Fair Lending Rep. ¶ 25,-023, pp. 25,272–4, interpreted these regulations in a particular case similar to the one at bar. The facts in *Dedham Housing* were nearly identical to the example set out in section 100.204, and the judgment in the agency's favor is thus not surprising.

In their brief, defendants point out that the example in section 100.204 and the decision by the ALJ both deal with situations where there are sufficient parking spaces for all the residents of the building so that the only issue was how best to apportion the spaces. They argue that in this case, by way of contrast, there is a condition of scarcity with insufficient spaces for all residents.

Although there are clear differences between the example given in the CFR and the present fact situation, these are differences of degree rather than of kind. It is not correct to state that the current problem

---

**8.** Although a defendant should not be required to assume "undue financial burdens" that does not mean that a defendant cannot be required to incur reasonable costs. *See Nelson v. Thornburgh*, 567 F.Supp. 369 (E.D.Pa.1983), *aff'd*, 732 F.2d 146 (3d Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985).

**9.** It has further been held that section 504 imposes an affirmative obligation to implement any requested accommodation that would not impose

such undue burdens. *See Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1384–85 (3d Cir.1991). A policy of "benign neglect" is not sufficient. *Id.* at 1385; *see also Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1186 n. 11 (E.D.N.Y.1993) ("[H]andicapped persons are entitled to preferential treatment under § 3604(f)(3)(b).") (emphasis in original).

deals with the allocation of scarce goods, whereas the situation in the CFR does not. The CFR example also clearly deals with a scarce good, namely, the valued parking spaces nearest the apartments. Giving the best spaces to handicapped individuals will clearly inconvenience those nonhandicapped individuals who also prize them. However, for the nonhandicapped individuals the prime parking spaces are a convenience, whereas for the handicapped they are instrumental to living as close to normal lives as possible.

In the situation at bar the good whose distribution is at issue is the parking space itself, not the best parking spaces. Although defendants correctly point out that the good in question here is more prized by the non-handicapped than the good in the CFR example (*i.e.*, nonhandicapped individuals value a parking space over no parking space far more than they value a prime parking space over a bad one), this is, in terms of the existence of a duty to accommodate, irrelevant as the handicapped will have the same preferences as the nonhandicapped, only of a far more intense degree due to their acute need (and not simple desire) for the spots. In other words, the fact that the stakes are higher in this situation is beside the point, as they are higher for everyone. Everyone has, as a result of his or her membership in the cooperative, a connection with the building's parking space which interests each to a different degree.

Defendants' only legal support for their position is found in cases involving seniority rights established under collective bargaining agreements between management and labor. *See, e.g., Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *Carter v. Tisch*, 822 F.2d 465 (4th Cir.1987); *Shea v. Tisch*, 870 F.2d 786 (1st Cir.1989); *Jasany v. U.S. Postal Service*, 755 F.2d 1244, 1250 (6th Cir.1985). Those cases are distinguishable both factually and legally. Factually, defendants' first come/first served policy is not a creature of contract. Nor does it fulfill any national goal recognized by statute. In *Trans World Airlines, Inc. v. Hardison, supra*, a Title VII case involving allegations of religious discrimination, the Court refused to disturb the seniority system and force some workers to work for others on religious holidays on the ground that "[c]ollective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national policy, and seniority provisions are universally included in these contracts." *Id.* at 79, 97 S.Ct. at 2274. The Court further noted that Title VII itself provides that a bona fide seniority system will not be unlawful under its provisions.

In another representative case, *Carter v. Tisch, supra*, an asthmatic employee of the post office sued under the Rehabilitation Act, claiming that the post office refused to accommodate his handicap by giving him "permanent light duty" jobs. The court noted that the language of the Rehabilitation Act only prohibits discrimination against the individual when he is "otherwise qualified." The court held that under the seniority system embodied in the collective bargaining agreement, plaintiff had not worked the number of years that would qualify him for the position and that he was, thus, not "otherwise qualified" for the position.

Accordingly, based on the statute, the legislative history, case law, and regulations promulgated by HUD [10] and mindful of the fact that this chapter "is to be construed generously to ensure the prompt and effective elimination of all traces of discrimination within the housing field," *United States v. City of Parma*, 494 F.Supp. 1049, *aff'd*, 661

---

**10.** Agency regulations implementing a statute are to be given "controlling weight." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also Gladstone v. Village of Bellwood*, 441 U.S. 91, 107, 99 S.Ct. 1601, 1611, 60 L.Ed.2d 66; *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972). Despite defendants' opposition, the charge of discrimination issued by HUD also constitutes persuasive (although hardly necessary) evidence of discrimination. *See, e.g., McClure v. Mexia Independent School District*, 750 F.2d 396, 399 (5th Cir.1985) (EEOC determination of reasonable cause admissible as circumstances did not indicate a lack of trustworthiness); *Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir.1972) (EEOC report including findings of probable cause, though not binding on court, sufficiently reliable to be "highly probative of the ultimate issue in such cases.").

F.2d 562 (1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982), I conclude that a "reasonable accommodation" of plaintiff's needs by reason of her handicap will in all probability require modification of defendants' first come/first served policy. In insisting that the policy of first come/first served remain inviolable whatever plaintiff's handicap and needs, defendants display the frame of mind which Congress sought to alter by requiring reasonable accommodations of the needs of the handicapped.

Although plaintiff has demonstrated a clear likelihood of success in establishing that defendants violated the FHAA, it would be inappropriate at this early point in the litigation to determine in any detail the manner in which defendants should accommodate those of its residents who are handicapped. Such a finding at this point would be an unnecessary judicial intrusion into the affairs of a private entity, despite the fact that defendants up to now appear to have given this aspect of its affairs little thought. As noted, defendants up to now have refused to make **any** accommodation.[11] It is expected that this ruling will stimulate them to consider the available options by which they may fulfill their statutory duties.[12]

Although this Court will not at this point determine what measures may ultimately prove necessary to accommodate plaintiff's handicap in a reasonable fashion, this is not an obstacle to ruling that plaintiff must in the interim be given the space she requires until such time as the trial of this matter is concluded or another reasonable accommodation is worked out. Defendants have not suggested that plaintiff, as one out of over 400 members of her cooperative, is making a demand out of line with the ratio of handicapped to nonhandicapped drivers in New York City. Nor have they suggested that she must compete with other handicapped drivers for the space or that she is not entitled to priority among them. Defendants have failed to propose other solutions, and plaintiff's irreparable harm outweighs any harm to defendants in meeting plaintiff's immediate needs.[13]

Accordingly, plaintiff's motion for a preliminary injunction is granted, and defendants are hereby enjoined from refusing to provide plaintiff with a parking space on the lobby/ground floor of Cadman Towers' garage at 101 Clark Street in Brooklyn, New York, in reasonable proximity to the building lobby.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.

11. Indeed, even after denying plaintiff's request for a parking space, she was not placed on the waiting list, an act of which plaintiff understandably complains as going beyond a refusal to accommodate into retaliatory discrimination.

12. Without intending to foreclose other accommodations or, indeed, prejudge whether any of the following are reasonable, the Board may wish to explore the designation of one or more spaces as handicapped spaces (the number presumably based on some reasonable evaluation of the ratio of handicapped to nonhandicapped drivers who might be expected, all things being equal, to request space). Since the concern has been expressed of handicapped residents taking over all or a disproportionate share of the existing spaces, it may also wish to explore the concept of a list for handicapped residents and a list for nonhandicapped residents, with a reasonable mechanism for determining in what ratio handicapped and nonhandicapped drivers are to be awarded vacant space.

13. Even if it were less difficult than it is to predict whether plaintiff will prevail on the merits, preliminary relief would still be available to her under the second prong of the preliminary injunction test. Under this test, plaintiff must show sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See Plaza Health Lab, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989). It is undeniable that this issue presents fair grounds for litigation. The balance of hardships also tilts decidedly in plaintiff's favor. As noted above, plaintiff will suffer irreparable harm from defendants' refusal to allow her a parking space. No comparable hardship will be suffered by defendants in giving her the space. Any one of three parking places are available to defendants simply by moving employees to commercial parking space in the close vicinity. The monthly cost of such space, when divided among the four hundred plus owners, is small when compared with plaintiff's problems out on the street. On the other hand, a more strict enforcement of the residents-only, one-space-per-resident policy would free up at least seven spaces for handicapped and nonhandicapped drivers.

128

## AMENDED ORDER

For the reasons stated and upon the findings of fact and conclusions of law set forth in this Court's Memorandum Decision and Order dated January 25, 1994, it is hereby

ORDERED that defendants, Cadman Towers, Inc. and Sydelle Levy, their agents, servants, attorneys, employees, and all those in active concert and participation with them be, and they hereby are, enjoined pending further order of this Court or the trial of this matter from refusing to provide plaintiff with a parking space on the lobby/ground floor of Cadman Tower's garage at 101 Clark Street in Brooklyn, New York, in reasonable proximity to the building lobby; and it is hereby further

ORDERED that the continued effectiveness of this preliminary injunction be and hereby is conditioned upon the posting of a bond by the plaintiff in the amount of $500 to secure payment of such costs and damages as may be incurred or suffered by defendants in the event it is found that they have been wrongfully enjoined.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.