91 F.3d 891
 19 A.D.D. 619, 8 NDLR P 341
 JANKOWSKI LEE & ASSOCIATES, River Park Development
Corporation, John R. Pankratz, et al., Petitioners,
v.
Henry G. CISNEROS, Secretary, Housing and Urban Development,
Respondent,
and
Andrew Rusinov, Intervenor-Respondent.
 No. 95-3051.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 16, 1996.
Decided July 30, 1996.
As Amended Aug. 26, 1996.
 
 William E. Hughes, III (argued), Whyte, Hirschboeck & Dudek, Milwaukee, WI, for Jankowski Lee & Associates, River Park Development Corporation, John R. Pankratz, Sue Sellin.
 Marie K. McElderry, Jessica Dunsay Silver, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, Michael Kalven, U.S. Department of Housing and Urban Development, Chicago, IL, Nelson Diaz, Department of Housing and Urban Development, Washington, DC, Michelle M. Aronowitz (argued), United States Department of Justice, Washington, DC, for Henry G. Cisneros.
 Thomas J. Erickson, Milwaukee, WI, for Andrew Rusinov.
 Before ESCHBACH, MANION, and EVANS, Circuit Judges.
 ESCHBACH, Circuit Judge.
 
 
 1
 On March 8, 1993, Andrew Rusinov filed a complaint against River Park Apartments (RPA), alleging that Petitioners Jankowski Lee & Associates and Sue Sellin discriminated against him based on his handicap in violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., (the "FHA") by refusing to make a reasonable accommodation in their rules, policies, practices and services related to parking. On September 30, 1994, the Department of Housing and Urban Development (HUD) issued a Determination of Reasonable Cause and Charge of Discrimination against Jankowski Lee and Associates, River Park Development Corporation, John R. Pankratz, and Sue Sellin (collectively, "Petitioners"), alleging that they had violated 42 U.S.C. §§ 3604(f)(2) and 3604(f)(3)(B). Administrative Law Judge Robert Andretta (the "ALJ") held a two-day hearing and issued an "Initial Decision and Order" holding that Petitioners had violated the FHA by failing to accommodate Rusinov's need for a parking space as close as possible to his apartment building. The ALJ enjoined Petitioners from discriminating against Rusinov, required Petitioners to assign Rusinov his own parking spot as close as possible to the RPA building, assessed a civil penalty of $2,500 against Petitioners jointly and severally, and awarded Rusinov $2,500 in compensatory damages. The Initial Decision and Order became the final order of the Secretary of HUD.
 
 
 2
 Petitioners seek review in this court of the final order of the Secretary. For the following reasons, we deny the request to review and affirm the Secretary's order.
 
 I.
 
 3
 Mr. Rusinov was diagnosed with multiple sclerosis ("MS") in 1982. For the first five years after the onset of the disease, Rusinov was severely disabled with paralysis from the waist down, loss of control of bodily functions, temporary blindness, slurred speech, and anxiety attacks. Since then, Rusinov's condition and the severity of MS's symptoms have varied with remissions, exacerbations, and relapse. Rusinov does everything in his power not to appear disabled because he feels that he is treated with less respect and credibility once other people see him as disabled. The documentation is, however, unequivocal that Rusinov's MS severely limits his activities.
 
 
 4
 In 1986, Rusinov moved into an apartment in the RPA complex. On his application for an apartment at RPA, Rusinov indicated that he was disabled and that he had MS. Petitioner Jankowski Lee & Associates is the managing agent for the owners of RPA. Petitioner Sellin is employed by RPA as the on-site manager.
 
 
 5
 The RPA complex consists of two apartment buildings. Most of RPA's residents are elderly and many use wheelchairs, walkers, or canes. The complex includes a total of 108 parking spaces. Before 1993, visitors were permitted to park in the RPA lot. In 1993, parking was limited to tenants only. Parking at RPA is permitted on a "first come, first served basis." As of December 1994, there were approximately 96 persons registered to park in the lot. In 1986, when Rusinov moved into RPA, there was one handicapped space at each of the two buildings. By March 1993, there were two handicapped spaces at each building.
 
 
 6
 Rusinov has had a car since he first moved into RPA. He has always had problems locating a space close to his building because the handicapped spaces and the nonhandicapped spaces close to the entrance are usually filled. Rusinov requires a large space that is close to the building for a number of reasons. Rusinov cannot get in and out of his car if it is parked in a narrow spot. Rusinov has trouble walking and he cannot walk great distances without resting. Rusinov does not have full, voluntary control of his bladder and carries a portable urinal for those times when he cannot find a space close enough to his apartment to use his bathroom.
 
 
 7
 In the fall of 1992, Rusinov and his father visited the RPA management office twice regarding parking. On the first visit, they asked the office secretary for an assigned space or a "sufficient" number of handicapped spaces to accommodate Rusinov's disability. The secretary, who had no authority to grant the request, told them she did not think it was possible and that they needed to speak to the manager, Petitioner Sellin. Rusinov and his father later returned to the office and told Sellin that Rusinov needed an assigned parking space because of his disability. Although this was the first time that Sellin spoke personally with Complainant, she had been informed by the office secretary that Rusinov had previously requested an assigned parking space. Without further inquiry, Ms. Sellin denied Rusinov's request and the office secretary told Rusinov and his father that Rusinov would have to take his chances in finding a spot close to the building.
 
 
 8
 Sellin testified that she knew Rusinov had MS, but that she did not know the degree to which the disease affected Rusinov's mobility. She denied the request because she did not consider it to be a reasonable request given that she had seen Rusinov walking to and from his car without any apparent difficulty.
 
 
 9
 In the complaint filed with HUD on March 8, 1993, Rusinov states, "I have asked the management to either increase the number of handicap spots or assign me a parking spot." Shortly after Rusinov filed his complaint with HUD, Petitioners increased the number of handicapped parking spaces at each building from two to four and added a van-accessible handicapped parking space to the lot in front of Rusinov's building.
 
 II.
 
 10
 Petitioners present two reasons why we should overturn the Agency's decision: First, Petitioners were not aware of the extent to which Rusinov's condition limited his mobility; and second, Petitioners argue that, as a matter of law, they did not violate the FHA because they granted Rusinov's request when they increased the number of handicapped parking spaces. We reverse the Secretary's decision only if it is "not in accordance with law," "without observance of procedure required by law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (D), and (E); Jancik v. HUD, 44 F.3d 553, 555 (7th Cir.1995). We review the entire record, but we do not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the agency. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir.1994).
 
 
 11
 Petitioners' first argument is essentially that Rusinov bore the burden of producing documentation establishing the extent of his handicap and his need for the requested accommodation. Petitioners admit that they knew that Rusinov had MS, but they argue that they were unaware that Rusinov's MS affected his mobility such that he needed an assigned parking space. Petitioners' denial of Rusinov's request based on their lack of knowledge of the extent of his injury is simply a ruse to avoid the penalty for violating the FHA. It is telling that Petitioners denied his request without asking Rusinov for more information regarding his condition. Regardless of their motive for pursuing the issue, however, Petitioners' position is untenable.
 
 
 12
 The FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap...." 42 U.S.C. § 3604(f)(2). This prohibition on discrimination also makes it unlawful to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(B). It is clear that Rusinov's MS is a handicap within the meaning of the FHA. 42 U.S.C. § 3602(h) (" 'Handicap' means, with respect to a person--(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment...."); Shapiro v. Cadman Towers, Inc., 844 F.Supp. 116, 123 (E.D.N.Y.1994), aff'd, 51 F.3d 328 (2d Cir.1995); cf. Carter v. Casa Central, 849 F.2d 1048 (7th Cir.1988) (Multiple Sclerosis is a "handicap" under analogous section of the Rehabilitation Act of 1973). The ALJ appropriately found that Rusinov is a handicapped individual under the meaning of the FHA, and Petitioners do not challenge that finding.
 
 
 13
 Petitioners were aware that Rusinov had MS, Rusinov's MS qualified as a handicap, Rusinov informed Petitioners that he required a parking space close to his building because of his handicap, and Rusinov requested an assigned parking space as a reasonable accommodation. At that point, Petitioners had a duty to make a reasonable accommodation. They did not make a reasonable accommodation, so they violated the FHA. It is irrelevant whether Rusinov's mobility did not "appear" to Petitioners to be limited by his MS. The existence of a handicap, as defined by Congress in 42 U.S.C. § 3602(h), does not depend on Rusinov's appearance, it depends upon his physical condition.[1] Petitioners denied Rusinov's request without asking for more information regarding the extent to which Rusinov's MS limited his activities. Had they asked, we presume that Rusinov would have provided them with the substantial documentation that he provided to HUD and the ALJ. If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue.
 
 
 14
 Petitioners' second argument is that they did all that the FHA requires when they increased the number of parking spaces in response to Rusinov's complaint. Rusinov's HUD complaint requested that Petitioners accommodate his disability by either increasing the number of handicap spaces or assigning a space to him. Petitioners increased the number of handicapped parking spots in front of Rusinov's building from two to four.
 
 
 15
 Petitioners cannot prevail on this issue because Petitioners' action still falls short of providing a "reasonable accommodation." Rusinov's complaint suggested two possible solutions, but both suggestions were simply alternative means to the end that is at issue in all FHA cases of this type: a request for a reasonable accommodation. Rusinov's complaint, in the same paragraph that offered the alternative solutions, stated that Petitioners had violated the FHA by their "failure to make a reasonable accommodation...." The FHA does not create a right to an assigned handicapped space any more than it creates a right to an increase in the number of handicapped parking spaces at RPA. The FHA does create a statutory right to a "reasonable accommodation." 42 U.S.C. § 3604(f)(3)(B). Rusinov's complaint was a request for a "reasonable accommodation."
 
 
 16
 Whether an accommodation is "reasonable" is a question of fact, determined by a close examination of the particular circumstances. United States v. California Mobile Home Park Management Co., 29 F.3d 1413, 1418 (9th Cir.1994). The ALJ appropriately found that the two additional handicapped spaces were not a "reasonable accommodation." Petitioners do not challenge this finding as a factual matter and the ALJ's finding was not clearly erroneous. Even after the additional spots were added, there were only eight handicapped parking spaces and one van space for the 27 tenants registered to park at RPA with handicapped stickers or tags for their vehicles. At night, the handicapped spaces and all of the parking spaces close to the entrance to Rusinov's building were usually taken. During the day, the handicapped spaces were filled between 50 percent and 75 percent of the time.
 
 
 17
 Two of the Petitioners raise an additional issue. Petitioners River Park Development Corporation ("RPDC") and John Pankratz argue that no credible evidence was presented that could tie them to any liability. The record contradicts their assertions. Owners of real estate may be held vicariously liable for discriminatory acts by their agents and employees. Chicago v. Matchmaker Real Estate Sales Center, 982 F.2d 1086, 1096-99 (7th Cir.1992), cert. denied, Ernst v. Leadership Council for Metropolitan Open Communities, 508 U.S. 972, 113 S.Ct. 2961, 125 L.Ed.2d 662 (1993); see also Marr v. Rife, 503 F.2d 735, 740 (6th Cir.1974). This principle applies to suits alleging violations of the FHA. Matchmaker, 982 F.2d at 1096. Building Manager Sellin testified that Petitioner Pankratz is one of the investors in RPA and the managing partner of RPA. She also testified that the decision to increase the number of handicapped parking spaces rather than assign Rusinov a separate space "was a mutual and joint agreement between myself, my supervisor, Mr. Paul Lee, [and] Mr. Pankratz, our managing partner...." Thus, the evidence is clear that Pankratz may be held liable.
 
 
 18
 The record satisfies us that the evidence was sufficient to hold RPDC liable for violating the FHA. Sellin testified that RPDC "is a limited partnership I believe of some of the owners of River Park Apartments." This testimony is, standing on its own, equivocal. Sellin might be saying that RPDC is one of several owners of RPA. On the other hand, she might mean that some (but not all) of the partners in RPDC are owners of RPA but that RPDC does not own RPA. This testimony before the ALJ did not stand alone. In her deposition testimony, Sellin stated: "River Park Development Company is the name of the partners who own part of River Park Apartments as a project, the investors." It was reasonable for the ALJ to find that RPDC owns RPA. In addition, documentation provided by the Petitioners establishes that Sellin sent Rusinov's security deposit to RPDC in 1986 for "deposit ... into the appropriate interest bearing accounts." Finally, in a letter in response to HUD's request for information and documentation regarding Rusinov's request, Petitioners state:
 
 
 19
 River Park Development Company Properties--one.
 
 River Park Apartments
 
 20
 1700 & 1600 E. River Park Ct.
 
 Shorewood, Wis. 53211
 215 Total Units
 
 21
 Petitioners' response indicates that RPDC[2] owned one property, River Park Apartments. There also was no evidence or testimony that RPDC does not own RPA.
 
 III.
 
 22
 For the foregoing reasons, the Petition for Review is denied and the ALJ's Initial Decision and Order and the Secretary's final order are, therefore, AFFIRMED.
 
 
 23
 MANION, Circuit Judge, dissenting.
 
 
 24
 Apparently Andrew Rusinov was severely disabled with MS from 1982 to approximately 1987. After that time period the symptoms varied with remissions, exacerbations, and relapse. He moved in the RPA in 1986, apparently while his condition was still severe. His original application in 1986 indicated he had MS, but he waited six years, until the fall of 1992, before requesting special accommodations.
 
 
 25
 Significantly, the court consistently refers to "Rusinov's MS." Although MS may result in a disability, it is not in itself a disability or handicap. It is a disease. The disease becomes a handicap when it causes "physical or mental impairment which significantly limits one or more of [a] person's major life activities." MS is an individualized disease, ranging from benign (very slight symptoms and limitations) to severe (total incapacity). See Carter v. Casa Central, 849 F.2d 1048, 1050 n. 1 (7th Cir.1988) (describing disabilities that might arise from MS).[1] Documentation and testimony at hearings before the ALJ disclosed that Rusinov's MS was somewhere in the middle range. But he was able to disguise or hide the outward symptoms; he felt he was "treated with less respect and credibility once other people [saw] him as disabled." The court states that "it is clear that Rusinov's MS is a handicap within the meaning of the FHA." Ante at 895. But that became clear only after a two-day hearing before the ALJ. He did not appear disabled to the management of RPA on the occasions they observed him between 1986 and 1992. Indeed, the ALJ determined that Ms. Sellin did not know that Rusinov's MS affected his mobility. (ALJ p. 10 para. 32)
 
 
 26
 Rusinov's request came at a time when his problems with MS had not been readily apparent. At the hearing he presented testimony and documentation that clearly indicated he was suffering with limitations at the time of (and years before) his request for special parking. Had he presented any of that documentation to Ms. Sellin to show that his situation required extra accommodations for parking, then petitioner's duty to make reasonable accommodations would be readily apparent. There is no doubt that had RPA known of Rusinov's condition as it was later ascertained at the two-day hearing, they would have been obligated by the Fair Housing Act to accommodate him in some fashion. RPA concedes as much. However the record before us is clear that RPA did not know of his condition, only of his disease.
 
 
 27
 The question then is when does knowledge of a disease put managers of an apartment complex on notice of a disability. The statute clearly addresses disabilities that "significantly limit one or more of [a] person's major life activities." It does not list diseases. For if a tenant's disease creates no disability, he is hardly entitled to an accommodation. Merely listing a disease on a rental application is not enough. Had Rusinov stated on his rental application six years earlier that rather than MS, he had diabetes or even AIDS would the apartment complex be on notice of any disability which that disease might later precipitate? The disability must in any event correspond to the accommodation sought; for example the law does not require parking spaces for people with hearing disabilities. Some diseases may cause any number of disabilities. Some diabetics have no limitations, others cannot walk, while still others lose their eyesight. Would the mere fact of listing such a disease coupled with a subsequent request for an assigned spot require the provision of such a spot? The answer is clearly no. The apartment is only required to make an accommodation to a resident's disability, not to his disease.
 
 
 28
 As the ALJ's opinion noted, it is unlawful in certain circumstances to inquire about the severity of a handicap. In fact not only did Rusinov hide his disability, the record reflects he was embarrassed by it and disinclined even to discuss it. So how was the RPA management to know that someone who was apparently doing reasonably well with his MS really needed accommodations that were not afforded the 26 other tenants who had handicapped stickers or plates? Who has the burden of informing an apartment complex of what disability a tenant suffers as the result of a disease? The burden must lie with the party that possesses the information rather than the party that does not. The burden should remain with the person with the disability seeking the accommodation. The D.C. Circuit in Langon v. Department of Health and Human Services applied this standard while considering the analogous Rehabilitation Act accommodation provisions. The court insisted that because an employee with MS had been successfully performing her job requirements without an accommodation, "it was therefore incumbent on the [employee] to provide evidence to [the employer] showing that her disease had interfered to the point where [performance without an accommodation] was no longer possible." 959 F.2d 1053, 1059 (D.C.Cir.1992). While the law requires accommodation, when a disability is not otherwise visible it is incumbent on the person seeking the accommodation to alert those from whom he seeks it of the conditions that require accommodation.
 
 
 29
 This court is overly critical of the petitioners. It is not a "ruse" to say they did not know the extent of Rusinov's MS. Ante at 895. In fact the ALJ found as much. It should not be an automatic violation to deny "reasonable accommodations" when petitioners were simply aware that Rusinov had MS at the time he requested a special parking slot. Even if, as the majority holds, a denial without seeking more information violates the "reasonable accommodation" requirement, the facts of this case do not merit a civil penalty of $2500 and damages of an additional $2500.
 
 
 30
 This statute is designed to achieve reasonable accommodations for disabled people, not to significantly punish people for inadvertent violations. The burden should be with the claimant to show that he has a disability that needed "reasonable accommodations." The ALJ and this court have placed the burden on the apartment manager to inquire further when the person requesting accommodations did not present any information (other than reiterating that he had MS as indicated on the application six years earlier) at the time of the request. I would be inclined to reverse the ALJ's Initial Decision and Order and the Secretary's final order on the finding of liability, and certainly on the penalty of $2500 and the award of damages of $2500. Therefore I respectfully dissent.
 
 
 
 [1]
 As the district court in Shapiro stated:
 [D]iscrimination against the handicapped often begins with the thought that she looks just like me--that she's normal--when in fact the handicapped person is in some significant respect different. Prejudice, it bears recalling, includes not just mistreating another because of the difference of her outward appearance but also assuming others are the same because of their appearance, when they are not.
 Shapiro, 844 F.Supp. at 121.
 
 
 [2]
 We recognize that the response letter states "River Park Development Company," not "River Park Development Corporation," the party named in this appeal. There is some indication from Petitioners' brief that River Park Development Corporation may not exist, but we presume that Attorneys for Petitioners would not perpetrate a fraud on this court by purporting to represent a nonexistent party
 
 
 [1]
 Carter did not hold that MS was a disability in and of itself. Rather the defendant in Carter conceded that Ms. Carter was a "handicapped individual" for purposes of the Rehabilitation Act. 849 F.2d at 1051