**Phyllis SHAPIRO and United States of America, Plaintiffs–Appellees,**

v.

**CADMAN TOWERS, INC. and Sydelle Levy, Defendants–Appellants.**

**No. 654, Docket 94–6053.**

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1994.

Decided March 21, 1995.

Alan G. Blumberg (Szold & Brandwen, P.C., New York City, of counsel), for defendant-appellant.

David Goldfarb (Goldfarb & Abrandt, New York City, of counsel), for plaintiff-appellee Phyllis Shapiro.

Mark L. Gross, Dept. of Justice, Washington, DC (Zachary W. Carter, U.S. Atty., E.D.N.Y. Brooklyn, NY, Deval L. Patrick, Asst. Atty. Gen.; and David K. Flynn, Dept. of Justice, Washington, DC, of counsel), for plaintiff-appellee U.S.

Before: LUMBARD and MINER, Circuit Judges, and SAND, District Judge.*

MINER, Circuit Judge:

Defendants-appellants Cadman Towers, Inc., a 400–unit city-aided cooperative apartment building in Brooklyn, and Sydelle Levy, the president of the cooperative's Board of Directors, appeal from an order entered on January 25, 1994 in the United States District Court for the Eastern District of New York (Sifton, J.) granting a preliminary injunction in favor of plaintiff-appellee Phyllis Shapiro, a Cadman Towers cooperative apartment owner who is afflicted with multiple sclerosis. The injunction, issued pursuant to the anti-discrimination provisions of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604(f), requires Cadman Towers, Inc. and Levy (collectively "Cadman Towers") to provide Shapiro with a parking space on the ground floor of her building's parking garage. For the reasons that follow, we affirm the order of the district court.

## BACKGROUND

In the late 1970s, plaintiff-appellee Phyllis Shapiro was diagnosed as suffering from multiple sclerosis ("MS"), a disease of the central nervous system. One of Shapiro's doctors, Lave Schainberg, describes the type of MS suffered by Shapiro as one that follows a "relapsing progressive course where the patient goes downhill in a stepwise fashion over many years and eventually, in 30 or 35 years, becomes totally confined to a wheelchair." While MS ordinarily is characterized by an "unpredictable course," the disease generally "manifest[s] itself by difficulty in walking, urinary problems, sensory problems, visual problems, and fatigue." Factors such as stress, cold temperatures, or infection tend to aggravate the symptoms. At times, Shapiro suffers physical weakness, difficulty in walking, loss of balance and coordination, fatigue, and severe headaches. During good periods, she can walk without assistance; at other times, she needs a cane or a wheelchair. Shapiro also suffers from severe bladder problems, resulting in incontinence. She presently catheterizes herself to relieve the buildup of urine.

In 1990, Shapiro moved into a two-bedroom apartment in Cadman Towers. During her first two years there, Shapiro used public transportation and private car services to commute to her job as a guidance counselor at a middle school and to various social events. However, each of these modes of transportation presented various difficulties to Shapiro because of her disease.

In early 1992, Shapiro acquired an automobile. Parking space in her Brooklyn Heights neighborhood, as in most parts of New York City, is extremely scarce. Initially, Shapiro parked her car on the street, taking advantage of a city-issued "handicapped" sticker that exempted her from normal parking rules and regulations. Even with that, however, it still was extremely difficult for her to find a parking spot, as many other persons who work or live in her neighborhood also have special parking privileges. Shapiro testified that the long delay in finding a parking space and walking to her building resulted in numerous urinary "accidents." When she used an indwelling catheter, this delay would cause the bag to fill up, resulting in pain and leakage.

The Cadman Towers apartment complex where Shapiro lives consists of two buildings and two parking garages. At 101 Clark Street, where Shapiro's apartment is located, there are 302 apartments and 66 indoor parking spaces. At 10 Clinton Street, there are 121 apartments and 136 parking spaces. The parking rate at either location is approximately $90 per month, considerably less than the $275 charged by the closest commercial garage.

* The Hon. Leonard B. Sand of the United States District Court for the Southern District of New York, sitting by designation.

Due to the disparity in numbers between apartments and parking spaces, Cadman Towers generally has adhered to a first-come/first-served policy when allocating parking spaces. Pursuant to this policy, an individual desiring a parking space makes a written request to have his or her name placed on a waiting list. An applicant first waits for a space at 10 Clinton, and, after being assigned one at that location, becomes eligible to await assignment of a space at 101 Clark. Parking-space users were required to live in Cadman Towers, and each apartment could be allocated only a single space. There were, however, exceptions to the building's usual policy. Six apartments had two parking spaces, apparently under a grandfathering arrangement, and at least one elderly resident was permitted to have her son, who works nearby, use her parking space. Also exempted from the first-come/first-served policy are three spaces given without charge to certain building employees as part of their compensation.

In February of 1992, Shapiro requested that a parking spot in the 101 Clark Street garage be made available to her immediately on account of her disability. This request was denied by the cooperative's Board of Directors, and Shapiro was advised to place her name on the appropriate waiting list. Her present counsel and her brother, who also is an attorney, then wrote to the Board, requesting that Ms. Shapiro receive an immediate parking spot. After receiving these letters and consulting with counsel, Cadman Towers took the position that any duty under the Fair Housing Act to accommodate Shapiro's disability did not come into play until she was awarded a parking space in the normal course. Once Shapiro became entitled to a parking space, the building would then attempt reasonably to accommodate her disability, perhaps by assigning her a parking space near her apartment.

On June 11, 1992, Shapiro filed a complaint with the Department of Housing and Urban Development ("HUD"), alleging housing discrimination under the Fair Housing Amendments Act. After an investigation, HUD issued a charge of discrimination on November 29, 1993. Shapiro elected, pursuant to 42 U.S.C. § 3612(a), to have her claims addressed in a civil action filed in the district court. On December 20th, she filed a complaint, pursuant to 42 U.S.C. § 3613, alleging that Cadman Towers' refusal to provide her with an immediate parking space violated the anti-discrimination provisions of the Fair Housing Amendments Act ("FHAA"), 42 U.S.C. § 3604(f). With her complaint, Shapiro also filed a motion for a preliminary injunction. On December 28, 1993, the United States filed a complaint against Cadman Towers, pursuant to 42 U.S.C. § 3612(*o*), alleging housing discrimination on the same grounds pleaded by Shapiro, and the two cases were consolidated.

After conducting an evidentiary hearing, the district court granted Shapiro's motion for a preliminary injunction on January 21, 1994. The injunction prohibited Cadman Towers from refusing to provide Shapiro with an immediate parking space on the ground floor of the garage at 101 Clark Street. The district court found that Shapiro would suffer irreparable harm absent injunctive relief, because without a parking space she is subjected to continued risk of injury and humiliation from her inability to walk distances and her incontinence. *Shapiro v. Cadman Towers, Inc.*, 844 F.Supp. 116, 122 (E.D.N.Y.1994). The court also determined that Shapiro was likely to succeed on the merits of her claim, concluding that the concept of reasonable accommodation "will in all probability require modification of defendants' first come/first served policy." *Id.* at 127. The court also determined that Shapiro would be entitled to preliminary relief under the alternative test that requires plaintiff to show "sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 127 n. 13. The court found that Cadman Towers would not suffer any significant harm in giving Shapiro a parking space for the duration of the litigation, because any of the three building employees could be relocated to a commercial garage at a *de minimis* cost. *Id.* The court also noted that the building could free up seven spaces simply by enforcing its own rules that each apartment should be allocated

only one parking space and that spaces should only go to residents. *Id.*

### DISCUSSION

*1. Legal Standards for Preliminary Injunctions*

 The standard for issuance of a preliminary injunction is well settled in this Circuit:

The party seeking the injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.

*Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991). "This second 'serious questions' prong is also frequently termed the 'fair ground for litigation' standard." *Able v. United States,* 44 F.3d 128 (2d Cir. 1994) (per curiam). Because Cadman Towers' challenged policy is not "government action taken ... pursuant to a statutory or regulatory scheme," *id.,* the injunction issued by the district court is sustainable if either standard is met, *see id.* We review the district court's issuance of an injunction for an abuse of discretion. *Resolution Trust,* 949 F.2d at 626. "Such an abuse of discretion typically consists of either applying incorrect legal standards or relying on clearly erroneous findings of fact." *Id.*

*2. Irreparable Harm*

 A showing of irreparable harm is essential to the issuance of a preliminary injunction. *See Sperry Int'l Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11–12 (2d Cir.1982). To establish irreparable harm, the movant must demonstrate "an injury that is neither remote nor speculative, but actual and imminent" and that cannot be remedied by an award of monetary damages. *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989) (quotation omitted). Here, the district court premised its determination of irreparable harm upon its finding that Shapiro was subject to risk of injury, infection, and humiliation in the absence of a parking space in her building.

Specifically, the court found that Shapiro suffers from "an incurable disease that gradually and progressively saps her strength and interferes with her balance and bodily functions." *Shapiro,* 844 F.Supp. at 122. The court summarized the impact of Shapiro's condition as follows:

Plaintiff's disease makes her a candidate for accidental loss of balance, particularly during the winter season when her condition is aggravated. In addition, her urinary dysfunction results in episodes of embarrassing humiliation and discomfort which could be significantly reduced were she allowed to park indoors. The inconvenience suffered by a typical city resident forced to deice the car after a winter snowstorm is mild when compared to the discomfort, stress, and ensuing fatigue experienced by plaintiff when faced with the same task.

*Id.* Cadman Towers contends that many of the factual findings upon which the district court premised its determination of irreparable harm were clearly erroneous, and that the injunction should be overturned for that reason.

a. Shapiro's Medical Condition

Cadman Towers contends that the district court erred by failing to give sufficient weight to the testimony of other building occupants and the building staff regarding their observations of Shapiro's condition. These witnesses testified that, prior to the initiation of the proceedings giving rise to this appeal, Shapiro had always appeared to walk normally and that they had never observed her using a wheelchair. In discounting these observations by lay observers unfamiliar with Shapiro's disease or its symptoms, the district court relied instead on the testimony given by Shapiro's medical experts, including her treating physician. *Shapiro,* 844 F.Supp. at 123. The district court's reliance on medical evidence adduced at the evidentiary hearing unquestionably was proper and the findings based thereon cannot be said to be clearly erroneous. *See D'Amico v. New York State Bd. of Law Examiners,* 813 F.Supp. 217, 223 (W.D.N.Y.1993) (treating physician's testimony ordinarily should

be given "great weight" in determining reasonableness of requested accommodation); *accord Pushkin v. Regents of the Univ. of Colo.,* 658 F.2d 1372, 1390 (10th Cir.1981). Moreover, any purported inconsistency between the lay witnesses' observations and the testimony of Shapiro's experts is, as the district court found, explainable by the fluctuating nature of Shapiro's symptoms.

Cadman Towers also takes issue with the district court's assessment of Shapiro's urinary difficulties, arguing that Shapiro's incontinence could be remedied by the permanent use of an indwelling catheter. While the district court did not make a specific finding with respect to this point, each party's expert testified that long-term use of an indwelling catheter was inadvisable due to the risk of serious complications, including recurring infections. It seems clear that the district court credited this testimony and found that the permanent use of an indwelling catheter was medically inadvisable for Shapiro. *See Shapiro,* 844 F.Supp. at 118. Inasmuch as this finding has substantial support in the record, it is not clearly erroneous.

b. Availability of Other Parking for Shapiro

Cadman Towers argues that Shapiro did not need a parking space in its garage, because she could park on the street in spaces set aside for handicapped persons or in a commercial parking garage. However, the district court found that parking spots on the street frequently were unavailable to Shapiro or were too far away, and this determination is supported by the record. Similarly, the record supports the district court's determination that, in view of the severity of the difficulties experienced by Shapiro, the closest commercial parking garage also is too far from her apartment.

In sum, we believe that the district court's factual findings with respect to Shapiro's medical condition and the associated hardships are well supported by the record and are not clearly erroneous. *See Anderson v. City of Bessemer,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). We therefore conclude that the district court did not err in determining that Shapiro would likely suffer irreparable physical and emotional harm absent issuance of the injunction.

*3. Likelihood of Success*

■ To establish Shapiro's likelihood of success on the merits, we must examine the statutory scheme under which she brings this suit. The Fair Housing Amendments Act of 1988 ("FHAA") was enacted to extend the principle of equal opportunity in housing to, *inter alia,* individuals with handicaps. *See* H.R.Rep. No. 711, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2178–79. Pursuant to section 6(a) of the Act, codified at 42 U.S.C. § 3604(f)(2)(A), it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person." Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B). The legislative history of this provision indicates that

> [t]he concept of "reasonable accommodation" has a long history in regulations and case law dealing with discrimination on the basis of handicap. A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted. This section would require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.

House Report 711, 1988 U.S.C.C.A.N. at 2186 (footnotes omitted).

Applying these principles, the district court concluded that Shapiro was likely to succeed on the merits of her FHAA claim, stating:

> In a case such as this, plaintiff's need to show a likelihood of success on the merits would usually translate into demonstrating that defendants had a duty to reasonably accommodate her request for a parking space and that no such reasonable accom-

modation was made. In the present case, however, defendants have conceded that they made no attempt at an accommodation, and the central issue for resolution remains only the existence of defendants' duty.

*Shapiro*, 844 F.Supp. at 123. After reviewing the FHAA, its legislative history, pertinent case law, and regulations promulgated by HUD, the district court "conclude[d] that a 'reasonable accommodation' of plaintiff's needs by reason of her handicap will in all probability require modification of defendants' first come/first served policy." *Id.* at 127. For this reason, the court held that Shapiro had demonstrated a "clear likelihood of success in establishing that defendants violated the FHAA." *Id.*

a. Interpretation of "Reasonable Accommodation"

■ Cadman Towers contends that the district court erred by failing to interpret the phrase "reasonable accommodation" used in 42 U.S.C. § 3604 in the same manner as the phrase has been interpreted under Title VII of the Civil Rights Act of 1964. Title VII requires an employer to "reasonably accommodate" an employee's religious observances or practices, provided that the requested accommodation would not work an "undue hardship" on the employer's business. 42 U.S.C. §§ 2000e(j), 2000e-2(a)(1). Cadman Towers contends that cases construing the term "reasonable accommodation" under Title VII consistently have held that the concept of "reasonable accommodation" requires only equal treatment and in no event extends to "affirmative action." *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 76–77, 84, 97 S.Ct. 2264, 2272–73, 53 L.Ed.2d 113 (1977) (Title VII's rule of "reasonable accommodation" did not require employer to compel a more senior worker to work a shift that the plaintiff could not work for religious reasons). Applying the Title VII standard for religious accommodation, Cadman Towers argues that, while Shapiro must be given an equal opportunity to use the building's parking garage, the court erred in granting her preferential treatment.

While Cadman Towers may be correct in its assertion that, under Title VII, any ac-commodation requiring more than a *de minimis* cost is an "undue hardship" and thus unreasonable, *see, e.g., Eversley v. Mbank Dallas*, 843 F.2d 172, 175 (5th Cir.1988), its reliance on Title VII is misplaced. We believe that in enacting the anti-discrimination provisions of the FHAA, Congress relied on the standard of reasonable accommodation developed under section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794.

Section 504 prohibits federally-funded programs from discriminating on the basis of a handicap and requires such programs to reasonably accommodate an otherwise-qualified individual's handicaps. The legislative history of section 42 U.S.C. § 3604(f) plainly indicates that its drafters intended to draw on case law developed under section 504, a provision also specifically directed at eradicating discrimination against handicapped individuals. *See* House Report 711, 1988 U.S.C.C.A.N. at 2186 & n. 66, 2189–90 & n. 74 (citing *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), a case construing section 504)); *see also United States v. California Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1416–17 (9th Cir.1994) (adopting same view).

The legislative history of section 3604(f) makes no reference to Title VII nor to the cases interpreting it. The absence of such a reference is highly significant, because the concept of reasonable accommodation under section 504 is different from that under Title VII. While the Supreme Court has held that section 504 was intended to provide for "evenhanded treatment of qualified handicapped persons" and that it does not "impose an affirmative-action obligation," *Davis*, 442 U.S. at 410–11, 99 S.Ct. at 2369, the Court explained in a later case that "the term 'affirmative action' referred to those 'changes,' 'adjustments,' or 'modifications' to existing programs that would be 'substantial' or that would constitute 'fundamental alteration[s] in the nature of a program' rather than those changes that would be reasonable accommodations," *Alexander v. Choate*, 469 U.S. 287, 300 n. 20, 105 S.Ct. 712, 720 n. 20, 83 L.Ed.2d 661 (1985) (citations and quotations omitted). Accordingly, "reasonable accommodation"

under section 504 can and often will involve some costs. *See Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d Cir.1982) ("[S]ection 504 does require at least 'modest, affirmative steps' to accommodate the handicapped....").

In light of the legislative history of section 3604, which specifically indicates that the term "reasonable accommodation" was intended to draw on the case law under section 504 of the Rehabilitation Act, and the fact that both provisions are directed toward eliminating discrimination against handicapped individuals, we conclude that the district court correctly relied on the standards for "reasonable accommodations" developed under section 504, rather than the more restrictive standard of religious accommodation developed under Title VII. Thus, Cadman Towers can be required to incur reasonable costs to accommodate Shapiro's handicap, provided such accommodations do not pose an undue hardship or a substantial burden.

### b. Duty to Accommodate Shapiro

■ Cadman Towers also argues that any duty to accommodate Shapiro has not yet arisen. In its view, only when Shapiro reaches the top of the parking garage's waiting list in the normal course will parking be a "service[] or facilit[y] ... [offered] in connection" with the rental of her dwelling. 42 U.S.C. § 3604(f)(2). We disagree. Pursuant to section 3604(f)(3)(B), Cadman Towers is required to make reasonable accommodations in its rules and practices so as to enable Shapiro to "use and enjoy [her] dwelling." As discussed above, without a nearby parking space, Shapiro is subjected to a risk of injury, infection, and humiliation each time she leaves her dwelling and each time she returns home. We agree with the district court that, under these circumstances, nearby parking is a substantial factor in Shapiro's "use and enjoyment" of her dwelling.

Further support for this conclusion is found in 24 C.F.R. § 100.204(b), a regulation promulgated by HUD that provides an example of a "reasonable accommodation" under the FHAA. The example set forth in section 100.204(b) posits a building with 300 apartments and 450 parking spaces available on a first-come/first-served basis, and states that the duty to make "reasonable accommodations" obligates the building management to reserve a parking space for a mobility-impaired tenant near that tenant's apartment. It explains the reason for this as follows:

> Without a reserved space, [the tenant] might be unable to live in [the apartment] at all or, when he has to park in a space far from his unit, might have difficulty getting from his car to his apartment unit. The accommodation therefore is necessary to afford [the tenant] an equal opportunity *to use and enjoy a dwelling.*

*Id.* (emphasis added). Although the situation before us is different from the example, because at Cadman Towers there are fewer parking spaces than apartments, this regulation makes it clear that the use and enjoyment of a parking space cannot be considered in isolation from the tenant's ability to use and enjoy her dwelling place, a right specifically protected by the FHAA. We cannot say that this interpretation is unreasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (agency regulations implementing a statute must be given "controlling weight" unless unreasonable).

Cadman Towers, however, attempts to use the example set forth in section 100.204(b) to support its position. It argues that HUD's inclusion of such an innocuous example of a reasonable accommodation must have been intended to demonstrate that only trivial burdens can be placed on property owners. This argument is without merit. "There is no suggestion in the regulations that [these examples] are intended to be exhaustive...." *United States v. Village of Marshall*, 787 F.Supp. 872, 878 (W.D.Wis.1991) (rejecting the same argument). Moreover, such an interpretation would be inconsistent with the Supreme Court's admonition that the Fair Housing Act be given a "generous construction," based on the importance of the anti-discrimination policies that it vindicates. *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211–12, 93 S.Ct. 364, 367–68, 34 L.Ed.2d 415 (1972).

### c. Rights of Other Tenants

Cadman Towers also argues that a reasonable accommodation under the FHAA cannot include displacing tenants who already have parking spaces assigned to them or interfering with the expectancy of persons already on the waiting list. It bases this argument on lines of cases under section 504 and Title VII involving seniority rights in the workplace in which courts have held that displacing workers with seniority is not a reasonable accommodation. *See Hardison,* 432 U.S. at 82–83, 97 S.Ct. at 2275–76 (under Title VII); *Eversley,* 843 F.2d at 175–76 (under section 504). Cadman Towers analogizes its first-come/first-served allocation of parking spaces to a traditional seniority system in the workplace, typically implemented under a collective bargaining act.

■ The extent to which a "reasonable accommodation" for a handicapped individual can burden or take away rights or privileges enjoyed by non-handicapped persons is an important question of first impression in this Circuit, particularly in the non-workplace context. However, it would be premature for us to reach this issue now. The district court found that Shapiro could be accommodated without displacing any existing tenants, because three parking spots are reserved for building personnel and these workers could park in a commercial garage. Moreover, the court found that one parking space was used by a person that did not live in the building. These findings are well supported by the record and will not be disturbed on appeal. Accordingly, four parking spaces were available for handicapped individuals that would not impair the rights of other non-handicapped building tenants. We note, however, that the policies implicated in collective bargaining and labor-relations cases, *see Hardison,* 432 U.S. at 79, 97 S.Ct. at 2274, are different from the policies implicated in the assignment of a parking space to a handicapped person.

### d. Conclusion as to Likelihood of Success

Based on the foregoing, we agree with the district court that defendants are under a duty to reasonably accommodate Shapiro's need for a parking space in Cadman Towers' parking garage. We also agree with the district court that this accommodation may involve some changes to Cadman Towers' present method of allocating parking spaces and may require the cooperative to incur some costs. In view of Cadman Towers' refusal to make *any* accommodations for Shapiro's handicap, reasonable or otherwise, we therefore conclude, as did the district court, that Shapiro has demonstrated a clear likelihood of success in establishing a violation of the FHAA.

### 4. Conclusion as to Issuance of the Injunction

Having upheld the district court's determinations that (1) Shapiro would likely suffer irreparable physical and emotional harm absent issuance of the injunction and that (2) Shapiro had demonstrated a clear likelihood that she will succeed on the merits of her FHAA claim, we conclude that the district court did not abuse its discretion by requiring Cadman Towers to provide Shapiro with a parking space in its garage during the pendency of this litigation.[1] Indeed, faced with Cadman Towers' failure to suggest any alternative solutions, the district court had little choice but to enter the injunction requested by Shapiro.

### CONCLUSION

For the foregoing reasons, the order entered in the district court is AFFIRMED.

---

1. In view of this conclusion, we need not address the district court's alternative holding that injunctive relief was available to Shapiro under the "fair ground for litigation" standard.