**INNOVATIVE HEALTH SYSTEMS, INC., Martin A., Maria B., Sophie C., and John Does, Nos. 1–3, Plaintiffs–Appellees,**

v.

**CITY OF WHITE PLAINS, The Zoning Board of Appeals of White Plains, Terrence Guerrier, Chair of the Zoning Board of Appeals of White Plains, White Plains Planning Board, and Mary Cavallero, Chair of the White Plains Planning Board, Defendants–Appellants,**

**S.J. Schulmann, Mayor of the City of White Plains, Defendants.**

No. 1032, Docket 96–7797.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1997.

Decided June 26, 1997.

Sally Friedman, Ellen M. Weber, Susan L. Jacobs, Paul N. Samuels, Legal Action Center of the City of New York, Inc., New York City, for Defendants–Appellants.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Stephen M. Marcellino, Richard S. Oelsner, Richard L. Elbert, and Guy J. LeVasseur, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, of counsel) for Plaintiffs–Appellees.

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Maya Wiley and James L. Cott, Assistant United States Attorneys for the Southern District of New York, New York City, of counsel), for Amicus Curiae United States of America.

McCullough, Goldberger & Staudt, White Plains, NY, for Amicus Curiae Cameo House Owners, Inc.

Before: WALKER, PARKER, and HEANEY,* Circuit Judges.

HEANEY, Senior Circuit Judge:

In December 1992, plaintiff-appellee Innovative Health Systems, Inc. ("IHS"), an outpatient drug- and alcohol-rehabilitation treatment center, began efforts to relocate to a building in downtown White Plains. After over a year of seeking permission from the city, IHS was ultimately denied the necessary building permit by the White Plains Zoning Board of Appeals ("ZBA"). On November 14, 1995, plaintiffs-appellees, IHS and five individual clients, initiated this action against the City of White Plains; Mayor S.J. Schulmann; the ZBA; Chair of the ZBA, Terrence Guerrier; the White Plains Planning Board; and Chair of the Planning Board, Mary Cavallero, (collectively, "the City"), alleging that the ZBA's zoning decision violated both Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12165 (1994), and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994). The plaintiffs-appellees moved for a preliminary injunction to prevent the City from interfering with IHS's occupation of the new site. The City cross-moved to dismiss the complaint. In a detailed and thorough opinion, the United States District Court for the Southern District of New York (Barrington D. Parker, Jr., Judge) granted the preliminary injunction and denied the motion to dismiss, except with respect to Mayor Schulmann. *Innovative Health Sys. v. City of White Plains,* 931 F.Supp. 222 (S.D.N.Y. 1996). The remaining defendants appeal. We affirm except with respect to one individual client, Martin A.

### I. Background

In 1992, Dr. Ross Fishman, Executive Director of IHS, decided that the program should move from its current facility to a building located in downtown White Plains. The new site was more than five times as large as the current site and was closer to a bus line and to other service providers that IHS clients frequently visit. Dr. Fishman planned to expand the services offered by IHS at the new site to include a program for children of chemically dependent persons. Therefore, IHS predicted an increase in the number of clients it would serve.

In December 1992, the Deputy Commissioner of Building for the City of White Plains informed IHS that its proposed use of the downtown site—counseling offices with no physicians on staff for physical examinations or dispensing of medication—qualified as a business or professional office under White Plains' zoning ordinance and thus

---

* The Honorable Gerald W. Heaney, United States Senior Circuit Judge for the Eighth Circuit, sitting by designation.

would be permissible in the zoning district. In January 1994, Dr. Fishman signed a lease for the new space. IHS paid a monthly rent of $8,500 from July 1, 1994 to June 30, 1995 and has paid $6,000 per month since July 1995. The leased space includes a section that formerly had been used as retail space. Dr. Fishman initially intended to renovate the former retail space for the treatment program and sub-lease the remaining space, which had previously been used as an office. In April 1994, IHS filed an application with the White Plains Department of Building for a building permit. Because the application requested a change of use from "retail" to "office," the Commissioner of Building ("Commissioner") referred it to the Planning Board for approval as required by the local zoning ordinance.

The application provoked tremendous opposition from the surrounding community, including Cameo House Owners, Inc. ("Cameo House"), a co-operative association representing resident-owners who lived in the remainder of the downtown building in which IHS sought to relocate, and Fashion Mall Partners, L.P. ("Fashion Mall"), the owner of a shopping mall located near the proposed IHS site. The Planning Board held two public meetings on the proposed use at which the opponents expressed their concern about the condition and appearance of people who attend alcohol- and drug-dependence treatment programs and the effect such a program would have on property values. Opponents also argued that the proposed use constituted a "clinic" and that, therefore, under the zoning ordinance, the use was a "hospital or sanitarium," an impermissible use in the zoning district. In response to this argument, at the Planning Board's request, the Commissioner reconsidered and reaffirmed his previous determination that the proposed site constituted permitted "office" use.

Because continued opposition caused delay and additional costs, IHS withdrew its application from the Planning Board. It instead applied to the Commissioner for a permit to renovate the former retail section of the downtown site, which did not involve a change of use or the Planning Board's approval. Again, however, the application was vehemently opposed by members of the surrounding community.[1]

To resolve the dispute, the Commissioner sought review of his decision by the White Plains Corporation Counsel. In his written opinion, the Corporation Counsel stated that, absent compelling authority to the contrary, the Commissioner's decision should stand. The Corporation Counsel considered the opponents' argument under the zoning ordinance and concluded that the Commissioner's interpretation was correct.[2] Accordingly, the Commissioner issued his final determination

---

1. Opponents submitted numerous letters to the Commissioner and the Mayor opposing IHS's proposed relocation primarily based on concerns about property values and neighborhood safety. Counsel for Cameo House sent the Commissioner a letter urging him to consider not only the technical zoning arguments against issuing the permit, but also that the use "poses a real quality of life problem for the residents of Cameo House" and would require an enormous increase in security measures to prevent the exposure of the residents to unwanted intrusion and possible harm. (J.A. at 112.) Cameo House also wrote to the Mayor requesting that he play a role in preventing IHS from moving downtown as he had done with a another chemical-dependency treatment center and stating that members of the community were "petrified at the thought of having the patients of IHS not only in the facility but on [their] very premises." (J.A. 115.) The Chair of the Planning Board, Cavallero, even sent the Commissioner a letter, in which she explicitly recognized that the board no longer had jurisdiction, but expressed the board's concerns about

whether IHS should be considered an "office" and whether the use was appropriate in a residential building.

2. In reaching his conclusion, the Corporation Counsel noted that although the definition of "hospitals or sanitaria" provides that they "may include out-patient clinics," the initial part of the definition states that they must be "institutions for the purpose of serving general medical, surgical, psychiatric, physical therapy and rehabilitation purposes." Because the terms are connected with "and," the ordinance's rules of construction require that for IHS's proposed use to fall under the definition, it would have to provide all of the services listed, which it clearly did not. The Corporation Counsel also contrasted IHS's proposed use with that of a methadone clinic found to qualify as a hospital or sanitaria because the clinic provided physical examinations, took urine specimens, dispensed medications, and kept a variety of medical equipment on the premises.

that the use was permitted and the Department of Building issued the building permit to IHS.

Cameo House and Fashion Mall immediately appealed the Commissioner's decision to the ZBA, requesting an interpretation of the zoning ordinance that an alcohol-treatment facility is not permitted in the relevant zoning district. The ZBA conducted a two-day public hearing on the matter, at which community members continued to voice strong opposition to having a drug- and alcohol-dependency treatment center in the downtown location. They again focused largely on fears of jeopardized safety and falling property values.[3] The opposition also pressed the same zoning arguments rejected by the Commissioner and the Corporation Counsel. IHS relied on the reasoning of the previous decisions and urged the ZBA to consider their consistency with already-permitted uses in the same zoning district. Specifically, IHS reminded the board that the zoning district of its former location also excludes "hospitals and sanitaria" and that several other mental health professionals and social workers practiced in the district of the proposed site.

On July 5, 1995, the ZBA voted four-to-one to reverse the Commissioner's decision. The Board did not issue a written resolution, as required by the zoning ordinance,[4] but rather stated on the record that, based on its understanding of the services IHS provides, it is better classified as a clinic than an office. Absent in their discussion, however, was any reference to the zoning ordinance or the Commissioner's interpretation.

IHS and five individual clients initiated this action against the City, alleging that the revocation of the building permit constituted discrimination and differential treatment based on a disability as against both the individual clients and the program that assisted them. They also claimed that even if the zoning decision was not discriminatory, the City should have permitted the relocation as a reasonable accommodation. In February 1996, they moved for a preliminary injunction against the City to prevent it from interfering with the occupation of the downtown site.

The City opposed the motion and moved for dismissal, arguing: (1) zoning decisions do not fall within the scope of the ADA or the Rehabilitation Act, (2) the appellees lack standing under the ADA, (3) the federal statutes do not accord preferential treatment to persons with disabilities, and (4) neither IHS nor the individual clients have demonstrated irreparable harm or a likelihood of success on the merits. The district court granted the preliminary injunction and denied the motion to dismiss, except as against the Mayor. The City now appeals, raising essentially the same arguments.

## II. Preliminary Injunction

■ We have jurisdiction to consider an appeal from the grant of a preliminary injunction as an appeal as of right under 28 U.S.C. § 1292(a). The district court found, as is required for the grant of a preliminary injunction, that the appellees demonstrated that they would suffer irreparable harm absent the injunction and that they are likely to succeed on the merits of their discrimination claim.[5] *See Shapiro v. Cadman Towers,*

3. At the hearing, opponents repeatedly referred to IHS clientele as "undesirable elements" who pose a real security risk. In a follow-up letter to the ZBA, a resident of Cameo House stated his belief that even if IHS clients were middle-class—which he questioned—they still could "exhibit the erratic, antisocial and sometimes illegal behavior we associate with an impecunious backslider." (J.A. 141.)

4. Section 10.4.5 of the White Plains Zoning Ordinance, in relevant part, provides:

Every decision of the Board of Appeals shall be by resolution; shall be recorded; and shall fully set forth the facts of the case, the findings

and the conclusions on which the decision was based. The Board shall decide on matters before it within 45 days after the close of the public hearing, unless such time limit is extended by mutual agreement with the applicant; shall immediately file its resolution in the office of the Board and shall within 10 days thereafter mail a copy of such resolution to the applicant.
(J.A. at 436–37.)

5. The district court also found—and the City challenges on appeal—that the appellees had demonstrated sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive

*Inc.,* 51 F.3d 328, 332 (2d Cir.1995). Although generally we review the grant of preliminary injunction for an abuse of discretion, *id.,* where, as here, the district court made the requisite findings based solely on a written record, we review the record de novo because we are in as good a position as the district court to read and interpret the submitted materials. *Doe v. New York Univ.,* 666 F.2d 761, 765 (2d Cir.1981).

■ As an initial matter, the City argues that the district court should have reviewed the evidence under the heightened standard for mandatory injunctions that requires a clear showing of entitlement to the relief sought or demonstration that extreme or serious damage would result absent the relief.[6] *See Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). The district court determined that the injunction IHS and its clients seek is prohibitory, rather than mandatory, because it prohibits the City from interfering with the program's relocation rather than requiring the City to perform an affirmative act. The injunction might also be characterized as mandatory, however, in that it alters the status quo by requiring the City to overturn the ZBA's decision and to permit IHS to occupy the downtown site.

As this circuit has recognized, the distinction between mandatory and prohibitory injunctions is often "more semantical than substantive." *Abdul Wali,* 754 F.2d at 1025; *see also Eng v. Smith,* 849 F.2d 80, 82 (2d Cir. 1988) ("[T]he doctrine that preliminary injunctions should be disfavored when they disturb the status quo has been subject to academic and judicial criticism.") (citing Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2948

(1973)). In light of this recognition, we do not believe that the district court erred in treating this preliminary injunction as prohibitory.

#### A. *Irreparable Harm*

■ In determining whether the appellees demonstrated irreparable harm absent injunctive relief, the district court relied heavily on the affidavits of Dr. Fishman and Maria B., a current IHS client. Dr. Fishman testified that clients have dropped out or missed critical therapy sessions because of the size and location of the current site and that the new space would permit IHS to better serve its current clients and to expand its services. He emphasized the great need for treatment programs generally, and specifically in White Plains, where a program at the county jail had recently been closed. Based on his experience, Dr. Fishman predicted that without treatment, IHS's current and potential clients are likely to continue to abuse alcohol and drugs, resulting in death, illness, or disability.

Maria B. testified that she has benefitted greatly from the services at IHS and that if IHS cannot move to the new site, she will most likely be unable to continue participating in her counseling sessions because of the poor public transportation to the current site. She also stated that she hoped to attend vocational training classes as part of her recovery but will not be able to do so unless IHS moves to the larger site and expands its services. Moreover, she stated that she fears that she will face a serious risk of relapse if she is forced to end her connection with IHS.

relief. *Innovative Health Sys. v. City of White Plains,* 931 F.Supp. 222, 244–45 (S.D.N.Y.1996). Because we affirm the district court's determinations as to both irreparable harm and likelihood of success on the merits, we need not address this alternative, lower-threshold standard.

6. The City alternatively argues that the heightened standard should apply because IHS seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme. IHS claims that the City failed to raise this argument before the district court and thus, the City has waived its right to assert it now. In

any event, the City has misrepresented the standard required in such circumstances. Our court has merely held that when such an injunction is sought, the district court should not apply the less rigorous fair-ground-for-litigation standard and should only grant the injunction if the moving party establishes, along with irreparable injury, a likelihood of success on the merits. *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989). Because the district court applied the likelihood-of-success-on-the-merits standard, we need not resolve whether the injunction sought actually falls under the governmental action exception.

Dr. Fishman articulates how Maria B. and the yet-to-be-identified, prospective IHS clients, John Does Nos. 1–3, will be harmed by denial of the building permit. His affidavit supports the appellees' position that preventing the relocation of IHS to the larger, more conveniently located site will necessarily prevent some alcohol- or drug-dependent persons and their children from receiving the counseling services they need. Without such services, these persons risk relapse and other physical harm. Maria B.'s affidavit reinforces the harm personal to her. Thus, the record supports the district court's finding of harm as to all appellees, except Martin A., one of the named individual clients.[7] The affidavits do not merely assert minor inconveniences, as the City characterizes them, but rather set forth a real need for the proposed relocation and the serious risks of harm to specific persons without it.

■ Moreover, although a significant delay in seeking injunctive relief can be indicative of a reduced need, *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985), the six-month delay between the ZBA decision and the appellees' motion does not negate their demonstration of harm. The delay was, in part, due to the ZBA's failure to send IHS a written decision and to the appellees' initial attempts to resolve the matter without litigation. Thus, we agree with the district court that the appellees have demonstrated that they would suffer irreparable harm, absent injunctive relief.

## B. *Likelihood of Success on the Merits*

The City also challenges the district court's determination that the appellees have demonstrated a likelihood of success on the merits, arguing primarily: (1) neither the ADA nor the Rehabilitation Act covers zoning decisions, (2) the appellees lack standing under both the ADA and the Rehabilitation Act, and (3) appellees have not stated a claim under either statute. We address each argument in turn.

### 1. *Application of Discrimination Statutes to Zoning*

■ Both Title II of the ADA and section 508 of the Rehabilitation Act prohibit discrimination based on a disability by a public entity. The ADA provides:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1994). The Rehabilitation Act contains the following similar prohibition:

No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a) (1994). It is undisputed that both anti-discrimination provisions govern the City. What the City contests is the application of either statute to its zoning decisions because it contends that zoning does not constitute a "service, program, or activity." We disagree.

■ The ADA does not explicitly define "services, programs, or activities." Section 508 of the Rehabilitation Act, however, defines "program or activity" as "all of the operations" of specific entities, including "a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A) (1994). Further, as the district court recognized, the plain meaning of "activity" is a "natural or normal function or operation." *Innovative Health Sys.,* 931 F.Supp. at 232 (quoting Webster's Third New International Dictionary (1993)). Thus, as the district court held, both the ADA and the Rehabilitation Act clearly encompass zoning decisions by the City because making such decisions is a normal function of a governmental entity. *Id.* Moreover, as the district court also noted, the language of Title II's anti-discrimination

---

7. There is no evidence in the record to support that Martin A. will suffer any harm absent relief. It is undisputed that he has completed the treatment program at IHS, and there is no indication that he has any continuing relationship with the program.

provision does not limit the ADA's coverage to conduct that occurs in the "programs, services, or activities" of the City. Rather, it is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context, and that should avoid the very type of hair-splitting arguments the City attempts to make here.

In its analysis, the district court also looked to the ADA's legislative history and the Department of Justice's regulations and Technical Assistance Manual, all of which support the court's interpretation of the plain language of the statute. With respect to Title II of the ADA, the House Committee on Education and Labor stated:

> The Committee has chosen not to list all the types of actions that are included within the term "discrimination", as was done in titles I and III, because this title essentially simply extends the anti-discrimination prohibition embodied in section 504 to *all actions of state and local governments.*
>
> . . . .
>
> Title II of the bill makes *all activities of State and local governments* subject to the types of prohibitions against discrimination against a qualified individual with a disability included in section 504 (nondiscrimination).

H.R.Rep. No. 101–485(II), at 84, 151 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367, 434 (emphasis added). As the preamble to the Department of Justice regulations explains, "[T]itle II applies to anything a public entity does. . . . All governmental activities of public entities are covered." 28 C.F.R. pt. 35, app. A at 456 (1996). The Department of Justice's Technical Assistance Manual, which interprets its regulations, specifically refers to zoning as an example of a public entity's obligation to modify its policies, practices, and procedures to avoid discrimination.[8] The Americans with Disabilities Act: Title II Technical Assistance Manual § II–3.6100, illus. 1 (1993) ("TA Manual").

Although it gives lip service to the importance of looking to the statutory language to glean legislative intent, the City does not point to specific language in either statute to explain the exemption it seeks to create for zoning decisions.[9] We decline to draw an arbitrary distinction—to prohibit public entities from discriminating against persons with disabilities in some of their activities and not in others—without a reasoned basis for such a distinction. The only authority for the City's interpretation of Title II are several lower court decisions that hold that the ADA does not apply to zoning decisions.[10] After

---

8. Arguing for a different "plain reading" of the discrimination statutes, the City contends that the court should not have looked to these other sources and that its interpretation of the statute should control. Although generally we do not look to legislative history when the language of a statute is clear, here, the court's consideration reinforced, not altered, the plain meaning of the ADA's prohibition. Moreover, the Department of Justice's regulations are entitled to controlling weight unless they are "arbitrary, capricious, or manifestly contrary to the statute," *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), and its manual is given substantial deference unless another reading is compelled by the regulation's plain language, *see Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 510–12, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994). We agree with the district court that there is nothing to suggest that the regulations are contrary to the statute or that either the preamble or the manual is inconsistent with the regulations.

9. The City argues vigorously that we should pay attention to the different language Congress employed in the two other titles of the ADA. We

agree with the district court's plain-language interpretation of Title II, however, and need not borrow from the language of either of the other titles. The City also argues that the district court erred in comparing the ADA to the Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1994) (FHA), again pointing out that where Congress uses different language, we should respect the difference. The district court's reference to the FHA was in a footnote and simply noted that courts have interpreted the similarly-broad prohibition of disability discrimination in the FHA to cover local zoning decisions, despite the absence of a specific reference to zoning in the statute. *Innovative Health Sys.,* 931 F.Supp. at 233 n. 5. We find no error in the district court's discussion of the FHA.

10. The City relies on the following cases: *Kessler Inst. for Rehabilitation, Inc. v. Mayor of Essex Fells,* 876 F.Supp. 641, 655 (D.N.J.1995); *Robinson v. City of Friendswood,* 890 F.Supp. 616, 620 (S.D.Tex.1995); *Oxford House, Inc. v. City of Albany,* 155 F.R.D. 409, 410–11 (N.D.N.Y.1994); *Moyer v. Lower Oxford Township,* 1993 WL 5489 at *2 (E.D.Pa.1993); *Burnham v. City of Rohnert Park,* 1992 WL 672965 at *3 n. 9 (N.D.Cal.1992).

careful review of the cited authority, we agree with the district court that none of the cases adequately analyzed the language of the ADA.[11] Similarly, we find no direction from any other circuit on this issue.[12] Without persuasive authority to the contrary, we affirm the district court's sound and thorough analysis.

### 2. *Standing*

 The City also challenges IHS's standing to sue under either the ADA or the Rehabilitation Act.[13] Although the City does not contest that IHS can meet the constitutional standing requirements of injury-in-fact, causation, and redressability, *see Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (setting forth the Article III requirements), it argues that prudential standing requirements bar IHS from asserting a claim under either statute. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205,

45 L.Ed.2d 343 (1975) (generally, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Specifically, the City argues that the discrimination statutes confer rights on a narrow class of persons, namely "qualified individual[s] with a disability," as set forth in both statutes' definitions of discrimination by public entities. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794; *see also Kessler,* 876 F.Supp. at 653 (holding that an entity that serves the disabled lacks standing under the ADA).

 At first blush, this argument has appeal. The City appropriately looks to the statutory language to determine whether Congress granted an express right of action to persons who otherwise would be barred by prudential standing rules. *See Warth,* 422 U.S. at 501, 95 S.Ct. at 2206 (as long as constitutional requirements met, Congress may grant standing to seek relief on the basis of the legal rights and interests of

---

The appellees counter by citing *Pack v. Clayton County, Georgia,* 1993 WL 837007 (N.D.Ga. 1993), which holds that the ADA prohibits local governments from administering licensing and zoning permit procedures in a manner that subjects persons with disabilities to discrimination on the basis of their disability. *Id.* at *8 (citing 28 C.F.R. § 35.130(b)(6)).

**11.** The first district court decision that touched on this question denied plaintiff's motion for preliminary injunctive relief primarily for her failure to demonstrate harm that was caused by the city's ordinances. *Burnham,* 1992 WL 672965 at *4. As an aside in a footnote, the court states that the plaintiff's ADA claim would fail because no "public program" was at issue in the case. *Id.* at *3 n. 9. Several other decisions simply rely on *Burnham* and subsequent cases and state without further discussion that a zoning amendment is not a "service, program, or activity." *See e.g. Kessler,* 876 F.Supp. at 655 (citing no other authority); *Robinson,* 890 F.Supp. at 620 (citing *Burnham, Oxford House,* and *Moyer,* although not explicitly deciding applicability question); *Oxford House,* 155 F.R.D. at 410 (relying on *Burnham* and *Moyer*); *Moyer,* 1993 WL 5489 at *2 (relying on *Burnham*). In *Oxford House,* the court reconsidered its grant of a motion to dismiss and acknowledged that had the plaintiffs argued for expansive application of the statute and cited to the legislative history or the Department of Justice's interpretations, they may have survived the motion. *Oxford House,* 155 F.R.D. at 411.

**12.** The appellees argue that the Third Circuit held that the Rehabilitation Act applies to the city's zoning decision in *Sullivan v. City of Pittsburgh, Pa.,* 811 F.2d 171, 181–83 (3d Cir.1987). Although the *Sullivan* court permitted a Rehabilitation Act claim based on a zoning decision to go forward, its discussion of the applicability of the statute to the dispute focuses on the city's simultaneous denial of federal funding through the community development, block-grant program. *Id.* The Eighth Circuit implicitly determined that the Rehabilitation Act applies to zoning decisions in its dismissal of a discrimination claim under the statute for the plaintiffs' failure to show that the decision was motivated "solely by reason of [their] disability." *Oxford House–C v. City of St. Louis,* 77 F.3d 249, 253 (8th Cir.1996).

**13.** Before the district court, the City also challenged the individual plaintiffs' standing, arguing that they had not demonstrated injury-in-fact as required to meet the minimum constitutional requirements for standing. *See e.g., Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (to demonstrate standing under Article III, must allege injury-in-fact, causation, and redressability). The City has not appealed the district court's determination that the individual plaintiffs have standing. As we discussed with respect to irreparable harm, however, Martin A. has not demonstrated any injury personal to him; thus, we hold that he does not have constitutional standing to assert this claim.

others). The City's analysis falls short, however, in its selective analysis of the statutes. It stops at the definitions of discrimination, which set forth a substantive, legal right of persons with disabilities to be free from discrimination. That IHS is not granted legal rights under the statutes, however, "hardly determines whether they may sue to enforce the ... rights of others." *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 1609 n. 9, 60 L.Ed.2d 66 (1979). Rather, we must look to whether the statutes "grant[ ] persons in the plaintiff's position a right to judicial relief." *Warth,* 422 U.S. at 500, 95 S.Ct. at 2206.

Looking to the enforcement provisions of each statute, we agree with the district court that IHS has standing under both Title II of the ADA and the Rehabilitation Act. Title II's enforcement provision extends relief to "*any person* alleging discrimination on the basis of disability." 42 U.S.C. § 12133 (1994). Similarly, the Rehabilitation Act extends its remedies to "any person aggrieved" by the discrimination of a person on the basis of his or her disability. 29 U.S.C. § 794a(a)(2). As the district court noted, the use of such broad language in the enforcement provisions of the statutes "evinces a congressional intention to define standing to bring a private action under 504 [and Title II] as broadly as is permitted by Article III of the Constitution." *See Innovative Health Sys.,* 931 F.Supp. at 237 (quoting *Nodleman v. Aero Mexico,* 528 F.Supp. 475, 485 (D.C.Cal.1981) (citing *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972))).

▮ With respect to Title II, the City further argues that we should respect the different language Congress chose to employ in Titles I and III, which define discrimination to include conduct directed at an entity based on its relationship or association with disabled persons. *See* 42 U.S.C. § 12112(b)(4) (Title I); 42 U.S.C. § 12182(b)(1)(E) (Title III). According to the City, because Title II does not contain similar language, Congress intended to pre-vent standing based on association under this section. Although courts generally should be reluctant to conclude that the omission of language in one part of a statute that is included in another is unintentional, *see e.g., City of Chicago v. Environmental Defense Fund,* 511 U.S. 328, 337–38, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994), there is extensive support in this instance to read the specific examples of discrimination from the other two titles into Title II.

As a starting point, Title II sets out only a general definition of discrimination. By listing specific examples of discriminatory behavior in the other two titles, Congress surely did not intend to excuse similar discriminatory conduct by a public entity simply because such conduct is not spelled out in Title II. This common-sense interpretation of Title II is confirmed by the legislative history. The House Committee on Education and Labor indicated that Title II's prohibitions are to be "identical to those set out in the applicable provisions of titles I and III of this legislation." H.R.Rep. No. 101–485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367. More specifically, the House Report on the ADA states that the prohibitions of discrimination on the basis of association from Titles I and III should be incorporated in the regulations implementing Title II. *Id.;* H.R.Rep. No. 485(III), at 51 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 474; *see also Kinney v. Yerusalim,* 9 F.3d 1067, 1073 n. 6 (3d Cir. 1993) (legislative history indicates that Titles II and III are to be read consistently).

▮ As directed by the House Report, the regulations implementing Title II provide:

> A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

28 C.F.R. § 35.130(g).[14] The preamble to section 35 acknowledges that the regulation

---

14. The preamble to the regulations explain:
   This protection is not limited to those who have a familial relationship with the individual who has a disability. Congress considered, and rejected, amendments that would have

is based on the relevant sections from Titles I and III and that "[t]his paragraph was not contained in the proposed rule." 28 C.F.R. pt. 35, app. A at 470. Based on the inconsistency between the rule and the regulation, the City argues persuasively that we should not give the regulation "controlling weight." In light of the specific congressional mandate to include this paragraph in the regulations, however, and the fact that this particular construction of discrimination is not "manifestly contrary" to Title II's general discrimination prohibition, we give the regulation the weight to which it is due. *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782–83.

In any event, because we have already determined that Title II provides relief to "any person alleging discrimination," it is irrelevant whether Title II directly proscribes discrimination based on association with disabled persons. Accordingly, we affirm the district court's determination that IHS has standing to assert a claim under both the ADA and the Rehabilitation Act.

### 3. *Appellees' Discrimination Claims*

Assuming that the discrimination statutes apply to zoning decisions and that the appellees have standing, the City contends that the district court erred in concluding the appellees will likely be successful on the merits of their discrimination claims. The City argues that the appellees' claims will fail because (1) IHS's clients are not "qualified individuals with a disability" because they

are not drug-free, (2) the appellees were not denied the benefits of the City's zoning activity, and (3) the City's zoning decision was not based on bias against chemically-dependent persons. We address each argument in turn.

██ The City claims that IHS has admitted that some of its clients are not drug-free and that therefore, under either statute the clients are excluded from the definition of "qualified individuals with a disability." *See* 42 U.S.C. § 12210(a) (term "does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use"); 29 U.S.C. § 706(8)(C)(i) (same). Although, we are not convinced that IHS has admitted that its clients are not drug-free,[15] the program indisputably does not tolerate drug use by its participants. An inevitable, small percentage of failures should not defeat the rights of the majority of participants in the rehabilitation program who are drug-free and therefore disabled under both statutes. *See* 42 U.S.C. § 12210(b)(2); 29 U.S.C. § 706(8)(C)(ii)(II).

██ The City also argues that the appellees have not been denied the benefits of the City's zoning activity because they were able to participate in every step of the process: They were given full consideration by the Commissioner, the Corporation Counsel, the Planning Board, and the ZBA. In so arguing, the City has misconstrued the nature of the appellees' complaint. The appellees' claim is not premised on the denial of the right to participate in the zoning approval process.

limited the scope of this provision to specific associations and relationships....

During the legislative process, the term "entity" was added to section 302(b)(1)(E) to clarify that the scope of the provision is intended to encompass not only persons who have a known association with a person with a disability, but also entities that provide services to or are otherwise associated with such individuals. *This provision was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities.*

28 C.F.R. pt. 35, app. A at 470 (emphasis added). Expanding on the regulation, the Technical Assistance Manual also explains:

This prohibition applies to cases where the public entity has knowledge of both the indi-

vidual's disability and his or her relationship to another individual or entity. In addition to family relationships, the prohibition covers any type of association between the individual or entity that is discriminated against and the individual or individuals with disabilities, if the discrimination is actually based on disability. TA Manual § II–3.9000 at 7 (1993).

15. Dr. Fishman states in his affidavit that participants in IHS's programs must be drug- and alcohol-free. The City's only evidence to the contrary is an assertion by its counsel that Dr. Fishman represented to Cameo House that only forty percent of its clients are alcohol- and drug-free. For the purpose of this motion, we accept Dr. Fishman's representation as to his own program over the double-hearsay statement by counsel for the defendant.

Rather, they allege that they have been denied the benefit of having the City make a zoning decision without regard to the disabilities of IHS's clients. They have therefore made a claim cognizable under both statutes of discrimination.

The City additionally contends that the appellees have not produced any evidence of the City's discriminatory motives in denying the building permit to IHS. There is little evidence in the record to support the ZBA's decision on any ground other than the need to alleviate the intense political pressure from the surrounding community brought on by the prospect of drug- and alcohol-addicted neighbors. The public hearings and submitted letters were replete with discriminatory comments about drug- and alcohol-dependent persons based on stereotypes and general, unsupported fears. *See supra* notes 1, 3. Although the City certainly may consider legitimate safety concerns in its zoning decisions, it may not base its decisions on the perceived harm from such stereotypes and generalized fears. As the district court found, a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter. *Innovative Health Sys.*, 931 F.Supp. at 243 (quoting *Association of Relatives & Friends of AIDS Patients v. Regulations & Permits Admin.*, 740 F.Supp. 95, 104 (D.P.R.1990)); *see also Support Ministries for Persons with AIDS, Inc. v. Village of Waterford, N.Y.*, 808 F.Supp. 120, 134 (N.D.N.Y.1992) (zoning officials who "bowed to political pressure" by those with animus against people with alcohol- and drug-related disabilities violated Fair Housing Act).

We also find the ZBA's decision to be highly suspect in light of the requirements set forth in the zoning ordinance. The Commissioner and the Corporation Counsel carefully reviewed IHS's application and gave detailed explanations for their approval. The Corporation Counsel analyzed the definition of "hospital or sanitaria" and concluded that because IHS was not an "institution for the purpose of serving general medical, surgical, psychiatric, physical therapy and rehabilitation purposes," it did not fall under this classification. The ZBA, on the other hand, simply stated, without explanation, that IHS was a clinic and thus an impermissible use in the downtown site. The ZBA ignored the requirements of the "hospital or sanitaria" classification and did not explain why it declined to follow the Corporation Counsel's straightforward analysis. Further, although made aware of other similar uses in the same district, the ZBA did not explain the distinction between IHS's proposed use and the other mental health professionals and social workers who do not work exclusively with chemically-dependent persons. On appeal, the City states that the ZBA's decision was "amply supported by legal arguments" without setting forth any of the supposed "legal arguments" for our consideration. The lack of a credible justification for the zoning decision raises an additional inference that the decision was based on impermissible factors, namely the chemical-dependent status of IHS's clients. Accordingly, we see no reason to disturb the district court's finding of likelihood of success on the merits.

### III. Motion to Dismiss

The district court's order partially denying the City's motion to dismiss is not a final decision under 28 U.S.C. § 1291 nor are we granted jurisdiction to hear an appeal from that order under any of the statutory exceptions, *see* 28 U.S.C. § 1292. The City urges us to exercise pendant jurisdiction over the order, however, because they argue that the issues involved are inextricably intertwined with the issues raised in the preliminary injunction motion. We see no reason to exercise such jurisdiction at this time and leave the progression of this case to the sound discretion of the district court.

### IV. Conclusion

Accordingly, we affirm the district court's grant of a preliminary injunction in favor of appellees, except with respect to Martin A., who lacks standing to pursue this claim.